**PENNZOIL COMPANY, et al.,**
**Petitioners,**

v.

**FEDERAL ENERGY REGULATORY**
**COMMISSION, Respondent.**

Nos. 79–1247, 79–1602.

United States Court of Appeals,
Fifth Circuit.

May 20, 1981.

As Modified on Denial of Rehearing
Aug. 21, 1981.

Baker & Botts, Charles M. Darling, IV, Charles E. Suffling, R. Gordon Gooch, Washington, D. C., John M. Young, Pennzoil Co., Claudia J. Ramsland, Patricia A. Curran, Thomas R. McKnight, Houston, Tex., for Pennzoil Co., Ashland Exploration, Tenneco Oil Co., et al., Pogo Producing Co.

Jerome Nelson, Sol., J. Paul Douglas, Robert R. Nordhaus, Washington, D. C., for Federal Energy Regulatory Commission.

Frank X. Kelly, Gallagher, Boland, Meiburger & Brosnan, Washington, D. C., for Texas Gas Transmission Corp.

Judy M. Johnson, Larry R. Veselka, John D. Taurman, Vinson & Elkins, Houston, Tex., for Independent Producer respondents.

Harold L. Talisman, Washington, D. C., for Tennessee Gas Pipeline Co.

David C. Henri, Ray G. Groussman, Cloy D. Monzingo, Houston, Tex., Bernard A. Foster, III, Nancy J. Hubbard, Washington, D. C., for Getty Oil Co.

Marilyn O. Adamson, Tulsa, Okl., for Amerada Hess Corp.

W. B. Wagner, Jr., Houston, Tex., for Superior Oil Co.

Jeffrey G. Shrader, William T. Sperry, J. Clayton LaGrove, Tulsa, Okl., for Williams Exploration Co.

Neal Powers, Jr., Byron A. Thomas, Butler, Binion, Rice, Cook & Knapp, Arthur S. Berner, Houston, Tex., for Inexco Oil Co. and ECEE, Inc., et al.

Thomas G. Johnson, Jr. Houston, Tex., for Shell Oil Co. and Tenneco Oil Co., et al.

David M. Whitney, Houston, Tex., for Aminiol USA, Inc., et al.

Carolyn S. Hazel, Tom Burton, Houston, Tex., for Conoco, Inc.

Frederick Moring, Jennifer Waters, Dana Contratto, Washington, D. C., for Associated Gas Distributors.

C. J. Roberts, John L. Williford, Larry Pain, Bartlesville, Okl., for Phillips Petroleum Co.

Goldberg, Fieldman & Letham, P. C., Washington, D. C., for Memphis Light, Gas & Water Division.

Janice E. Kerr, J. Calvin Simpson, Lawrence Q. Garcia, San Francisco, Cal., for the People of State of Cal., et al.

Paul W. Fox, Washington, D. C., for Damson Oil Corp.

George J. Domas, New Orleans, La., for Terra Resources, Inc.

Robert D. Haworth, T. P. Hamill, R. C. Elmore, Houston, Tex., for Mobil Producing Texas & New Mexico, Inc., Mobil Oil Corp., Northern Natural Gas Producing Co. and Mobil Exploration & Producing Southeast, Inc.

Jeffrey D. Komarow, Washington, D. C., for State of Mich. and Michigan Public Service Commission.

Richard G. Harris, Oklahoma City, Okl., for Kerr-McGee Corp.

Peter W. Hanschen, Malcolm H. Furbush, Robert Ohlbach, Harry W. Long, Jr., San Francisco, Cal., for Pacific Gas and Electric Co.

Peter H. Schiff, Gen. Counsel, Albany, N. Y., Richard A. Solomon, Wilner & Scheiner, Dennis Lane, Washington, D. C., for Public Service Commission of State of N. Y.

Justin R. Wolf, George H. Rothschild, Jr., Washington, D. C., for Chevron U. S. A., Inc.

Lawrence E. Glenn, Robert W. Fuller, Gulf Oil Corp., Lauren Eaton, Houston, Tex., for Gulf Oil Corp.

Paul J. Broyles, John A. Ramsey, Karen A. Berndt, Houston, Tex., for Texaco, Inc.

C. Roger Hoffman, Martin N. Erck, D. W. Rasch, M. W. Cockrell, Jr., Houston, Tex., for Exxon Corp.

Dennis J. Roberts, II, Atty. Gen. of R. I., Providence, R. I., for Rhode Island Division of Public Utilities and Carriers.

William T. Benham, Chicago, Ill., for Amoco Production Co.

William A. Sackmann, Marathon Oil Co., Findlay, Ohio, for Marathon Oil Co.

William T. Miller, Stanley W. Balis, Miller, Balis & O'Neil, Washington, D. C., for Gas Consumers Group.

Robert R. Reis, Carmen Gonzalez, Tulsa, Okl., for Cities Service Co.

Paul W. Hicks, Dallas, Tex., for Placid Oil Co.

James P. Holland, Charleston, W. Va., for Columbia Gas Transmission Corp.

Becky McGee, James D. Olsen, Dallas, Tex., for Sun Oil Co. (Delaware).

Robert W. Henderson, Dallas, Tex., for Hunt Oil Co.

Robert G. Hardy, Thomas F. Ryan, Jr., Joseph A. Cannon, Washington, D. C., for Transcontinental Gas Pipe Line Corp.

Kenneth L. Riedman, Jr., Los Angeles, Cal., for Union Oil Co. of California.

Edward J. Kremer, Jr., David Aston, Dallas, Tex., for Atlantic Richfield Co.

Gary G. Sackett, Salt Lake City, Utah, for Mountain Fuel Supply Co.

Thomas D. Clarke, John S. Fick, Los Angeles, Cal., for Southern California Gas Co.

Before HENDERSON, ANDERSON and SAM D. JOHNSON, Circuit Judges.

SAM D. JOHNSON, Circuit Judge:

The continuing battle between producers and consumers over natural gas prices is once again before this Court. The issue in this controversy can be simply stated: May "area rate clauses"[1] in existing interstate gas purchase contracts escalate the contract price to the maximum lawful price provided in the Natural Gas Policy Act of 1978? NGPA, 15 U.S.C.A. §§ 3301–3432. In the orders on review, the Federal Energy Regulatory Commission[2] (FERC) held that the NGPA was no bar to that escalation and that area rate clauses as a general rule constituted sufficient contractual authority to collect NGPA ceiling prices. FERC then established a procedure whereby interstate pipelines, FERC Staff, state regulatory commissions, local distribution companies, and consumer groups could contest the contractual sufficiency of specific area rate clauses. Most producers complain that FERC did not go far enough, while consumers think that FERC went too far in providing a presumption in favor of area rate clause escalation to NGPA ceiling prices. This case raises questions concerning the meaning of the NGPA and its interrelationship with the Natural Gas Act of 1938. NGA, 15 U.S.C.A. §§ 717–717w. It also raises a question concerning the application of the constitutional reasoning in *Erie Railroad v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). This Court for the most part affirms and in small part sets aside and modifies the FERC orders.[3]

I. FACTS

A. *Escalator Clauses and the NGA*

Seven years after the Supreme Court's decision in *Phillips Petroleum Co. v. Wis-*

1. An "area rate clause" is a price escalation provision in a natural gas purchase and sales contract between a producer and interstate pipeline. It authorizes an escalation in the contract price whenever there is an increase in the applicable just and reasonable wellhead ceiling price for the category of gas involved.

2. On October 1, 1977, the Commission took over the functions and responsibilities of the Federal Power Commission pursuant to the Department of Energy Organization Act § 402(a), 42 U.S.C.A. § 7172(a), and Exec. Order No. 12009, 42 Fed.Reg. 46267 (Sept. 15, 1977).

3. These orders, all promulgated in Docket No. RM79–22, are: Order No. 23, Amendment and Clarification of the Commission's Interim Regulations Implementing the Natural Gas Policy Act of 1978 and Regulations Under the Natural Gas Act (March 13, 1979); Order on Rehearing of Order No. 23 (May 11, 1979); Order No. 23–A, Amendment and Clarification of Interim Regulations Under the Natural Gas Policy Act of 1978 and Regulations Under the Natural Gas Act (June 12, 1979); Order No. 23–B, Adopting Final Regulations and Establishing Protest Procedure (June 21, 1979); Order on Rehearing of Order No. 23–B (August 6, 1979); Order on Rehearing of Order No. 23–A (August 13, 1979).

*consin,* 347 U.S. 672, 74 S.Ct. 672, 98 L.Ed. 1035 (1954), brought interstate gas producers within NGA rate regulation, the Federal Power Commission (FPC) in 18 C.F.R. § 154.93 prohibited the operation of certain indefinite price escalator clauses in interstate gas purchase contracts.[4] These clauses permit upward price adjustments on the occurrence of some specified triggering event. The most common of these were favored nation clauses, which generally provided that the contract price would automatically escalate to any higher prices that the pipeline purchaser, or another pipeline in a described geographic area known as the contract pricing area, paid for gas from that same defined area.[5] The FPC prospectively prohibited these clauses as contrary to the public interest because they increased the contract price by reference to events that had no economic significance to the particular sale of gas—the price one particular producer receives has no bearing on another producer's revenue needs or costs of production.[6]

The FPC amended section 154.93 to allow certain indefinite price escalator clauses to operate. One of these, the so-called "area rate clause," was made permissible by the addition of section 154.93(b–1). Order No. 329, 36 F.P.C. 925 (1966). This allowed the use of "[p]rovisions that permit a change in price to the applicable just and reasonable area ceiling rate which has been, or which may be, prescribed by the Commission for the quality of the gas involved." The permissible escalation was in the public interest since the area ceiling rate—a just and reasonable rate since it was derived by a cost-based methodology—did have economic significance to the gas in question.

To sell gas interstate, a producer must receive permission in the form of a certificate of public convenience and necessity. Under NGA § 7, 15 U.S.C.A. § 717f, the Commission has the power to condition the grant of the certificate. This power gave the FPC the ability to further enforce its prohibition in section 154.93 by rejecting any contract executed after April 2, 1962, that contained an impermissible clause.[7] Because many contracts contained clauses that were prohibited, the Commission later adopted the practice of attaching "waivers" of section 154.93 to the certificates. This allowed the clauses to operate, but only as area rate clauses. The Commission thus did not have to reject these contracts and require their refiling after the parties negotiated amendments to expunge a clause that, under a literal application of the regulation, would deprive the producer of the applicable just and reasonable rate.

4. *See Pure Oil Co.* (FPC Opinion No. 341), 25 F.P.C. 383 (1961), *aff'd, Pure Oil Co. v. FPC,* 299 F.2d 370 (7th Cir. 1962); FPC Order No. 232, 25 F.P.C. 379, *modified,* Order No. 232–A, 25 F.P.C. 609 (1961), *petition for review dismissed, Sun Oil Co. v. FPC,* 304 F.2d 290 & 293 (5th Cir.), *cert. denied,* 371 U.S. 861, 83 S.Ct. 118, 9 L.Ed.2d 99 (1962); FPC Order No. 242, 27 F.P.C. 339 (1962), *petition for review dismissed, Hunt Oil Co. v. FPC,* 306 F.2d 878 (5th Cir. 1962). These orders were later upheld in *FPC v. Texaco, Inc.,* 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964); *Pan Am. Petroleum Corp. v. FPC,* 352 F.2d 241 (10th Cir. 1965); *Superior Oil Co. v. FPC,* 322 F.2d 601 (9th Cir. 1963), *cert. denied,* 377 U.S. 922, 84 S.Ct. 1219, 12 L.Ed.2d 215 (1964). For a summary of the history of FPC regulation of escalation clauses, *see* 4 H. Williams & C. Meyers, Oil & Gas Law § 726.1, at 763–69 (1977).

5. Other indefinite price escalator clauses included spiral escalation, redetermination, and renegotiation clauses. *See, In Re Permian Basin Area Rate Cases,* 390 U.S. 747, 782 n.46, 88 S.Ct. 1344, 1367–1368 n.46, 20 L.Ed.2d 312 (1968); H. Williams & C. Meyers, Manual of Terms, Oil and Gas Law 196–97 (4th ed. 1976). In contrast, a definite price escalation clause increases the price by specific amounts at definite future dates, such as a step-price or periodic increase clause. *Id.* at 138, 196–97.

6. *See In Re Permian Basin Area Rate Cases,* 390 U.S. 747, 782–83, 88 S.Ct. 1344, 1367–1368, 20 L.Ed.2d 312 (1968). The basis of FPC producer rate regulation was a carry over of the cost-based methodology for utility rate regulation. In effect, the FPC found that these escalator clauses resulted in a contract price that, because of its lack of cost justification, was unjust and unreasonable under NGA § 4, 15 U.S.C.A. § 717c.

7. FPC Order No. 242, 27 F.P.C. 339 (1962), *voided, Texaco, Inc. v. FPC,* 317 F.2d 796 (10th Cir. 1963), *rev'd* 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964).

The FPC later abandoned its approach to producer rate regulation of prescribing rates for particular areas and instead adopted nationwide rates of general applicability.[8] Despite the literal language of section 154.93(b–1) and the language of area rate clauses that literally tracked the regulation, the FPC permitted producers and interstate pipelines to rely on area rate clauses to escalate the contract price to the national ceiling rates. The FPC also allowed area rate clauses to escalate the contract price to ceiling rates for qualifying sales of small producer gas,[9] rollover contract gas,[10] and flowing but undedicated gas.[11]

### B. Escalator Clauses and the NGPA

The NGPA was enacted on November 9, 1978. This statute generally adopted an incentive-based approach to rate-setting for gas production, providing substantially higher prices for "new" gas than was currently available.[12] At the same time, the NGPA provided consumer protection by maintaining lower prices on flowing gas, providing only limited future price deregulation in 1985, and extending price controls to intrastate sales of gas.[13]

Because the structure of regulation between the NGA and the NGPA was substantially different, and because the literal language of section 154.93(b–1) referred to just and reasonable area ceiling rates prescribed by the Commission, doubt arose whether area rate clauses in existing interstate contracts provided sufficient contractual authority, and whether the NGPA or section 154.93(b–1) precluded their operation, to collect the applicable maximum lawful NGPA price.

On November 29, 1978, FERC issued its Interim Regulations implementing the NGPA. In 18 C.F.R. § 270.205 FERC provided:

§ 270.205 *Indefinite price escalator clauses.*

(a) The establishment of maximum lawful prices under the NGPA shall not trigger indefinite price escalator clauses in existing intrastate or interstate contracts.

(b) For purposes of this section, the term "indefinite price escalator clause" shall have the same meaning as provided in section 105(b)(3)(B) of the NGPA.

The preamble to the Interim Regulations explained that section 270.205 incorporated the discussion in H.R.Rep.No.1752, 95th Cong., 2d Sess. 83 (1979), the Conference Committee Report on the final bill. This discussion related to the effect of the establishment of NGPA ceiling prices on indefinite price escalator clauses in existing intrastate contracts. FERC took the position that the interim regulation was consistent with the Conferees' discussion; FERC considered that discussion to be equally applicable to existing interstate contracts.

---

**8.** FPC Opinion No. 699, 51 F.P.C. 2212 (1974), *modified,* Opinion No. 699–H, 52 F.P.C. 1604, *aff'd, Shell Oil Co. v. FPC,* 520 F.2d 1061 (5th Cir. 1975), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2661, 49 L.Ed.2d 394 (1976); FPC Opinion No. 749, 54 F.P.C. 3090 (1975), *reh. denied,* Opinion No. 749–C, 55 F.P.C. —— (1976), *aff'd in part and set aside in part, Tenneco Oil Co. v. FERC,* 571 F.2d 834 (5th Cir.), *cert. dismissed,* 439 U.S. 801, 99 S.Ct. 43, 58 L.Ed.2d 94 (1978); FPC Opinion No. 770, 56 F.P.C. —— (1976), *reh. denied,* Opinion No. 770–A, 56 F.P.C. ——, *aff'd, American Public Gas Ass'n v. FPC,* 567 F.2d 1016 (D.C.Cir.1977), *cert. denied,* 435 U.S. 907, 98 S.Ct. 1456, 55 L.Ed.2d 499 (1978).

**9.** FPC Opinion No. 742, 54 F.P.C. 853, 858 (1975).

**10.** FPC Opinion No. 699, 51 F.P.C. at 2274–75.

**11.** *Id.*

**12.** FERC had initiated a new national rate proceeding but stayed it in light of the pendency of the NGPA. Order No. 23, No. RM79–22, Slip Op. at 31 (Mar. 13, 1979). Speculation thus abounds as to what price level FERC would have set for incentive categories had the NGPA not been enacted.

**13.** The recurring, severe shortages on interstate pipelines during the Seventies spurred enactment of the NGPA. The NGPA's higher prices were intended both to increase the supply of gas reserves and production and to decrease consumption demand at the end-use level. *See* H.R.Rep.No.496, pt. IV, 95th Cong., 1st Sess. 101 (1977); Congressional Budget Office, The Natural Gas Compromise Report 2 (1978), *reprinted in* 124 Cong.Rec. H13126–27 (daily ed. Oct. 4, 1978).

FERC then heard oral arguments concerning the NGPA's effect on area rate clauses and other price escalator clauses.

In a Policy Statement of January 24, 1979, FERC announced that, under a "plain meaning" construction, area rate clauses do not constitute contractual authority for the collection of NGPA ceiling prices. "Variant clauses"—escalation provisions that do not precisely reflect the exact language of section 154.93(b–1)—were considered inoperative under the regulation. These variant clauses additionally refer to rates established by any successor or other governmental authority. For intrastate contracts, the Commission explained that escalator clauses may increase the contract price in accordance with the contract terms, but not in excess of the applicable ceiling, and FERC would leave the interpretation of these clauses to the parties and state courts. FERC did, however, provide that the parties to an existing interstate gas purchase contract were free to enter into amendments to provide the requisite contractual authority to collect NGPA rates. FERC also held that NGPA § 601(c)(2), which guarantees to interstate pipelines the pass-through of NGPA prices except in cases of fraud or abuse, would not preclude pass-through of increased purchased gas costs from a contract amendment in an arm's length transaction merely because the pipeline was unable to show an economic benefit from the amendment to its ratepayers. Finally, FERC indicated that the contractual amendment could be retroactive to December 1, 1978.

On February 13, 1979, FERC issued a Notice of Proposed Rulemaking to promulgate specific regulations effectuating the statement of policy. Extensive comments were again submitted. Those comments revealed that most interstate pipelines agreed that area rate clauses were sufficient contractual authority for producers to collect NGPA prices. FERC reversed its proposed position and issued Order No. 23.

In Order No. 23, FERC examined the legislative history of the NGPA and concluded that there was insufficient evidence to mandate the view that Congress intended to preclude the operation of area rate and variant clauses to collect NGPA prices. Lacking a clear prohibition, the doubt was resolved in favor of no statutory preclusion.

FERC also held that section 154.93(b–1) neither bars nor makes ineffective both area rate clause and variant clause escalation to NGPA prices. FERC looked not to the literal language of the regulation, but instead focused more broadly on its purpose and the past FPC practice of flexibly, rather than literally, applying section 154.93(b–1) in a changing regulatory environment. Since the regulation was founded on the FPC's conclusion that the impermissible clauses were contrary to the public interest, the touchstone for application of section 154.93(b–1) is whether the escalation is in the public interest. Since NGPA rates are generally applicable ceiling rates, such escalation was not contrary to the public interest. Clauses made impermissible by section 154.93, however, would continue to be inoperative, or given only the effect of an area rate clause in accordance with any certificate waiver, if the gas under the contract is still within FERC's NGA jurisdiction.

FERC then turned to the question of contractual authority. Because area rate clauses vary considerably in their wording, and because at least one pipeline viewed its area rate clauses as escalating only to rates determined by agency proceedings, safeguarded by adversary participation and opportunity for judicial review of agency findings, FERC decided that a dispositive construction was impossible. Instead, FERC would provide a forum to give varying language and differing interpretations proper airing in the context of construing specific clauses. To provide guidance in these proceedings, FERC stated a general, administrative view with regard to contractual interpretation, while emphasizing that this was not to be taken as a dispositive view.[14]

14. FERC has continued to grapple with this question. The continuing evolution of interpretative aids is made evident by the Order on Rehearing of Order No. 23, Order No. 23–B,

Since it is the intent of the parties that is controlling on whether a particular clause authorizes collection of NGPA rates, FERC would endeavor to ascertain and give effect to the contracting parties' intention. FERC stated that the wording of a particular clause and the effect ascribed to it by the contracting parties would "generally be determinative." Although the contracting parties are not the only parties in interest to existing interstate gas purchase contracts, great weight is given to the parties' interpretation in questions of contract construction. The generally agreed interpretation asserted by substantially all sellers and buyers in the rulemaking comments was that the parties intended that the area rate clause permit escalation to the highest ceiling price permitted by governmental authority. FERC concluded that this was not an unreasonable interpretation of the contracting parties' intent, even for clauses that track the literal language of section 154.93(b–1). It therefore viewed variant clauses as even stronger cases for finding contractual authorization. Absent specific contractual language to the contrary, FERC would not interpose any general objection to the parties' reliance on area rate or variant clauses as authority to collect NGPA prices, and would give considerable weight to the mutual interpretation of the contracting parties.[15] The Commission also stated that it would not interpose any general objection to escalations by indefinite price escalators in existing intrastate contracts.

In the Order on Rehearing of Order No. 23, FERC clarified its view on contractual interpretation. It expressly rejected the "plain meaning rule" it had adopted in the Notice of Proposed Rulemaking, which requires, in the absence of ambiguity, a literal interpretation of the contract solely by reference to its language. Instead, FERC will interpret area rate clause language in light of its commercial context. This context includes the then prevailing scheme of NGA regulation and its limitation in section 154.-93 at the time the clause was drafted. In Order No. 23–B, FERC noted that the course of the parties' conduct subsequent to the contract's execution can shed light not just on the contract's meaning, but may evince a modification of its original terms, such as by flexible adaptation of the use of area rate clauses as the regulatory environment changed.

The Commission established a protest procedure in Order No. 23–B for the determination of contractual authority in specific cases. The protest procedure is limited to gas over which FERC retains some continuing nonprice regulatory control under the NGA. This limits the protest procedure to existing interstate contracts that cover gas entitled to NGPA §§ 104, 106(a), 108, or 109(a)(2) maximum lawful prices.[16] FERC

and Independent Oil & Gas Association of West Virginia (FERC Opinion No. 77), Nos. RI74–188 & RI75–21 (Mar. 4, 1980), *petition for review dismissed, Pennzoil v. FERC*, No. 80–1492, 645 F.2d 394 (5th Cir. May 20, 1981). In Opinion No. 77 FERC articulated in great detail the principles it intends to apply when resolving specific contractual interpretation disputes. Opinion No. 77 is not before us in this petition for review and therefore this Court does not directly pass on it here. We note, however, that consistent with its position in Order No. 23, FERC is continually refining its guidelines to interpretation of escalation clauses.

15. Order No. 23–B further elaborated on what that considerable weight would be. FERC redefined this weight as a rebuttable presumption of the accuracy of the interpretation. More specifically, FERC will presume that the parties know what they intended when they executed the contract, and that they are truthful in their assertion of that intent.

16. Section 104, 15 U.S.C.A. § 3314, applies to gas committed or dedicated to interstate commerce on November 8, 1978, the day before the NGPA was enacted, and for which a just and reasonable rate under the NGA was in effect on that date. The maximum lawful price under this section is essentially a carry forward of the latest FPC national rate opinion. The only difference is that the NGPA substitutes its own more sophisticated inflation adjustment escalator.

Section 106(a), *id.* § 3316(a), applies to gas under any "rollover" contract that was committed or dedicated to interstate commerce on November 8, 1978. The maximum lawful price is again a carry forward of the earlier FPC national rates. The purpose of this section is to lock-in flowing gas to the earlier contract

required that interstate pipelines submit the evidence the contracting parties claim authorizes the collection of higher rates since pipelines are in a better position than producers to supply the needed information to FERC and to interested persons.[17]

These procedures are open not only to interstate pipelines, but to "third parties" such as the Commission Staff, state regulatory commissions, local distribution companies, and consumer groups. Although FERC will give considerable weight to the contracting parties' mutual interpretation, FERC will not allow that interpretation to control where it is unreasonable in light of the language of the contract and the conduct of the parties. As set forth in both Order No. 23–B and Order on Rehearing of Order No. 23–B, FERC adopted a bifurcated procedure for handling protests by third parties to the contracting parties' assertion of authority. If express contractual language is inconsistent with the parties' mutual interpretation, a hearing is ordered; if the language is not inconsistent, the protest is summarily dismissed unless the protestor submits other specific evidence that explains or modifies the text of the contract.[18]

In other words, the protestor has the burden of coming forward with substantial evidence of the lack of contractual authority to overcome the presumption that the contracting parties' assertion regarding their intent is accurate and not unreasonable. If the protestor meets the burden of production, the contracting parties bear the burden of persuasion at the hearing to show by a preponderance of the evidence that contractual authority exists.

Pipeline protestors, however, do not face these same procedural presumptions to reach a hearing—if the contracting parties cannot agree as to their intent, there is no presumption concerning that intent that must be overcome. In these cases, the burden of proof is entirely on the seller since he is the party seeking the rate increase.

Finally, in Order No. 23–A, FERC held that in any event the pipeline and producer are free to amend their contract to provide for collection of an applicable NGPA price. In connection with the NGPA's disallowance of amounts paid by the pipeline due to fraud, abuse, or similar grounds, FERC stated that it would resolve those issues on a case-by-case basis rather than by promul-

price even though the existing interstate contract expired and has been replaced by a "rollover" contract. A "new" contract is one executed on or after November 9, 1978, for gas not previously subject to an "existing" contract, while the latter is one in effect on November 8, 1978. NGPA §§ 2(11) & (13), *id.* §§ 3301(11) & (13). A "successor to an existing contract" is one other than a "rollover" contract, executed on or after November 9, 1978, for gas previously subject to an existing contract, while a rollover is one executed on or after November 9, 1978, for gas previously subject to an existing contract that expired at the end of a fixed term specified in the contract. NGPA §§ 2(12) & (14), *id.* §§ 3301(12) & (14). The distinction between successors and rollovers is directed at contracts cancelled by one or both parties rather than the life of a contract coming to its natural end.

Section 108, *id.* § 3318, applies to gas from a "stripper well," that is, gas not associated with crude oil production from a well that produces not more than an average of 60 Mcf per day. Other than deregulated gas, this category receives the most favorable pricing treatment.

Section 109(a)(2), *id.* § 3319(a)(2), applies to gas committed or dedicated to interstate commerce on November 8, 1978, and for which a

just and reasonable rate under the NGA was not in effect on that date.

17. The evidentiary submission must contain (1) the rate schedule number or date of each contract for which the seller has filed for a higher NGPA rate; (2) the seller's name for each contract; (3) the NGPA section or sections applicable to sales under each contract; (4) the text of the contractual provisions, as well as any other evidence such as the subsequent course of the parties' conduct, that the pipeline believes constitutes or may constitute the contractual authority to escalate the price to the NGPA ceiling; and (5) a list of those contracts that the pipeline contends do not authorize collection of a higher price.

18. The protest must specifically identify the contract it addresses, include the text of the contract, and state the protestor's reasons why he or she believes it to be inconsistent with the conclusion that the contract authorizes the collection of higher rates. The protest may include other specific evidence, such as the commercial context or subsequent conduct of the parties, that demonstrates a lack of contractual authority.

gating a general rule. It therefore rejected any requirement of additional consideration for the contract amendment, or other evidence of arm's length bargaining, before allowing a pipeline to pass through to its customers the higher prices paid under the amendment.[19]

### C. *The Parties' Positions*

The positioning of the parties in this litigation appears complex, but can be simplified. There are three groups of petitioners: Pennzoil Company, *et al.*; Indicated Producers; and Consumer Petitioners and Intervenors (hereinafter Consumers).[20] The Pennzoil producer group filed petitions for review in the Fifth Circuit. Consumers filed petitions for review in the District of Columbia Circuit. The Indicated Producers filed in this and in other Circuits.[21] This Court determined that the winner of this venue "race to the courthouse" was the Pennzoil producer group, thus venue was ultimately vested in this Circuit and all cases were consolidated here.

The Pennzoil producer group and the Indicated Producers (which together will be referred to simply as Producers) ask this Court to reverse the orders on the ground that FERC should have conclusively declared area rate and other escalation clauses to be sufficient authority to collect NGPA prices. They demand that the protest procedures be invalidated because, if there is no question of authority, there is nothing to protest. Consumers, on the other hand, urge reversal on the ground that the statute, FERC regulations, and contract law

preclude the use of area rate and variant clauses to collect NGPA prices. They further insist that the protest procedures violate due process and should not have been limited to gas remaining within FERC's NGA jurisdiction.

### II. *FERC COMPLIANCE WITH THE ADMINISTRATIVE PROCEDURE ACT*

■ FERC's position in Order No. 23 was a sharp change from that in its Notice of Proposed Rulemaking. Fundamentally, this demonstrates not that the agency acted arbitrarily, but simply that the administrative process was working. The purpose of the Administrative Procedure Act (APA) notice and comment requirement is that the agency educate itself before adopting a final order. This assures fairness and mature consideration of rules having a substantial impact on those regulated. *See Brown Express Co. v. United States*, 607 F.2d 695, 701 (5th Cir. 1979). Simply because a different rule is adopted does not require a new notice and comment procedure if, as required by 5 U.S.C.A. § 553(b)(3), the notice of proposed rulemaking includes the terms or substance of the proposed rule or a description of the subjects and issues involved. This requirement is to sufficiently and fairly apprise interested parties of the issues involved, rather than to specify every precise proposal that the agency may ultimately adopt. *Action for Children's Television v. FCC*, 564 F.2d 458, 470 (D.C.Cir.1977).

■ In this case, all interested persons had ample opportunity to present their

---

**19.** The Notice of Proposed Rulemaking indicated that contractual amendments for NGPA ceiling price collection could operate retroactively back to December 1, 1978. This position was taken out of fairness in that FERC's policy on area rate clauses was not issued until after the NGPA's effective date. In Order No. 23, the Commission noted but did not address the criticisms that it lacked authority to allow the retroactivity of such amendments. In FERC's view, its position in that order substantially decreased the need for amendments, which obviated the need to discuss retroactivity. In Order No. 23–A, the Commission was strangely silent on retroactivity. Nor was this matter resolved by the Order on Rehearing of Order

No. 23–A. FERC merely adopted the suggestion that it make clear it has adopted no policy, rule, guideline, or presumption whether contract amendments may operate retroactively.

**20.** The Independent Producer Respondents intervened solely in support of FERC's position.

**21.** This spectacle of a race to the courthouse prompted this Court to amend its local rules on February 1, 1980. Local Rule 11 governs review of FERC orders. Local Rule 11.5 addresses venue, and provides that any dispute as to priority of institution of proceedings in two or more courts of appeal will be referred to FERC for findings of fact.

views on every facet of area rate clause operation under the NGPA. On January 12, 1979, FERC issued an order providing for written comments and oral argument before the full Commission on the legal and policy issues relating to the NGPA's effect on area rate and other price escalator clauses in interstate and intrastate contracts. The order listed nine questions that the written and oral comments should address. These questions covered every substantive issue involved in the later proceedings—the effect of the NGPA, the effect of section 154.93, contractual interpretation by the parties, FERC's authority to interpret price escalator clauses, the possibility of contractual amendment, and the economic consequences of allowing escalation.

FERC again received input after it issued the February 13, 1979, Notice of Proposed Rulemaking that set forth its specific proposal to implement the January 24, 1979, statement of general policy. In making their comments, the parties not only had the Notice's further elaboration of the issues, they also had the dissenting views of Commissioners Smith and Sheldon.

Since FERC had a duty to consider the submitted comments, and since modification of proposed rules in light of written and oral presentations is the heart of the rulemaking process, FERC did not violate the APA.

## III. THE NGPA AND AREA RATE CLAUSE ESCALATION TO NGPA CEILING PRICES

The text of the statute itself, its legislative history, and the structure and policy of the NGPA do not preclude area rate clauses from escalating the interstate contract price to the maximum lawful NGPA price. Nor does it, on the other hand, require such escalation.

### A. Ceiling Prices, Vintage Pricing, and Contractual Escalation

The NGPA concept of "maximum lawful price" or "ceiling price" does not, contrary to the Consumers' contention, indicate an intent to preclude escalation to NGPA prices by existing contracts. A ceiling price sets a maximum above which the sales price cannot go, but at the same time does not set a minimum; the sales price, given sufficient economic conditions, can be established at a point below that ceiling. A ceiling price must be distinguished from a "controlled" price. The latter is both a maximum and a minimum allowable price. With price ceilings, as opposed to controlled prices, the parties are free to contract for sale prices at or below, but not above, the ceiling. Similarly, the parties may adopt amendments increasing or decreasing the contract price so long as the amended price does not exceed the ceiling. Upward contractual escalation of the contract price does not convert the ceiling price into a price floor, but is instead consistent with the existence of a cap on price increases. Consumers' contention otherwise is inconsistent with past FPC price regulation, since area rate clauses escalated contract prices to newly established, higher FPC ceilings.

Nor does the NGPA's vintaging by price category—giving an incentive rate for gas that needs it such as "new" gas, but not for gas that needs no incentive such as already flowing gas [22]—preclude escalation. The vintaging is effected through the price category eligibility requirements. [23] The

**22.** "[A] two-price rate structure will both provide a useful incentive to exploration and prevent excessive producer profits." *In Re Permian Basin Area Rate Cases,* 390 U.S. 747, 798, 88 S.Ct. 1344, 1376, 20 L.Ed.2d 312 (1968). .

**23.** Eligibility turns on factual distinctions. Most are physical in nature: distance between wells; depth of completion locations; the date on which surface drilling began, on which production was dedicated to interstate commerce, or on which a reservoir was penetrated or discovered; average daily production; and special geological characteristics (geopressurized brine, coal seams, and Devonian shale). Many are legal: federal or state well-spacing requirement compliance; inclusion within a federal or state proration unit; the type of contract the gas is sold under (existing, successor, or rollover interstate or intrastate contract); state or Indian ownership of the production or royalties; and the intrastate contract price level. A

NGPA would generate any additional consumption cost savings, through the preclusion of area rate clause escalation, only if the NGPA incorporated existing contract prices as the maximum lawful price. This brings us to the main battleground over the interpretation of the statute: NGPA § 101(b)(9). This provides:

**§ 3311. Inflation adjustment; other general price ceiling rules**

. . . .

**(b) Rules of general application.—**. . . .

**(9) Effect on contract price.—**In the case of—

(A) any price which is established under any contract for the first sale of natural gas and which does not exceed the applicable maximum lawful price under this subchapter, or

(B) any price which is established under any contract for the first sale of natural gas which is exempted under part B of this subchapter from the application of a maximum lawful price under this subchapter,

such maximum lawful price, or such exemption from such a maximum lawful price, shall not supersede or nullify the effectiveness of the price established under such contract.

To properly decide whether section 101(b)(9) codified the existing contract price as the maximum lawful price, however, a brief review of the "*Mobile-Sierra*"[24] doctrine is necessary.

### 1. *The Mobile-Sierra Doctrine*

In the *Mobile* case, the issue was whether NGA § 4 gave a seller any power to avoid a fixed price contract simply by filing with the Commission a proposed rate increase without the concurrence, and even over the objection, of the buyer. Under NGA § 4(d), no change in rates can be made except after thirty days notice to the Commission. Whenever any such rate increase filing is made, the Commission has the authority under section 4(e) to hold a hearing on the lawfulness—the justness and reasonableness—of the rate increase.[25]

The basic thrust of *Mobile* is that the NGA did not displace but only superimposed federal regulation on private contractual arrangements. The Supreme Court contrasted the NGA, which by virtue of its ceiling price structure allows parties to set the rates initially by contract, with the Interstate Commerce Act, which by its uniform rate requirement (that is, controlled prices) precludes initial contractual ratesetting. In light of this difference, the *Mobile* Court concluded that the NGA did not abrogate private rate contracts, but simply provided protection for the public interest through the statutory filing procedures and notice requirements and the Commission's power to review rate increases and modify them if found unlawful. The Court noted that the NGA presumes seller capacity to make and change rate contracts, but these private contractual powers remain undefined and unaffected by the NGA. These powers are therefore no different than those which sellers would possess absent the NGA. Otherwise valid changes are ineffective without the required notice to the Commission; the NGA's existence provides no basis to validate unilateral contract changes, no additional powers to make or change rates, only notice to and review by the Commission.

---

few distinctions are economic: production in paying or commercial quantities, and production that involves extraordinary risks or costs.

**24.** *United Gas Pipe Line Co. v. Memphis Light, Gas & Water Division*, 358 U.S. 103, 79 S.Ct. 194, 3 L.Ed.2d 153 (1958) (Harlan, J.); *Federal Power Commission v. Sierra Pacific Power Co.*, 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956) (Harlan, J.); *United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956) (Harlan, J.).

**25.** During the 30 day period the Commission may suspend the proposed rate increase for up to five months to determine whether the new rate is just and reasonable. If after five months no determination is made, the proposed rate increase becomes effective automatically, subject to refund if the Commission later finds the new rate is not just and reasonable.

■ In essence, then, since a seller needs contractual authority to collect NGA rates, a seller needs contractual authority to legally file for a rate increase under NGA § 4(d). Simply put, rate filings consistent with contractual agreements are valid; those inconsistent with contractual obligations are not. *Richmond Power & Light v. FPC*, 481 F.2d 490, 493 (D.C.Cir.), *cert. denied*, 414 U.S. 1068, 94 S.Ct. 578, 38 L.Ed.2d 473 (1973). If the seller lacks authority to make the filing, the Commission lacks jurisdiction to entertain the filing and to determine the lawfulness of the rate increase.[26] Contractual authority thus was a threshold issue that the Commission had to face.

In *Mobile* the seller had a fixed price contract and therefore lacked authority to make a unilateral rate increase filing.[27] In *Memphis*, the seller had a "going rate" contract that left the price term open; the Court held that this gave the seller authority to file unilaterally for rate increases. The *Memphis* Court also noted that contracts with provisions to change the rate during the contract term—escalation clauses—would be valid contractual authority to make a unilateral rate increase filing, subject only to the limits and procedures of the NGA.

## 2. NGPA § 101(b)(9).

■ With this conceptual framework in mind, it becomes apparent that section 101(b)(9) does not codify existing contract prices as the ceiling price. Section 101(b)(9) provides that the applicable maximum lawful price, or any applicable price deregulation, "shall not supercede or nullify the effectiveness of the price established under" any contract that does not exceed the applicable maximum lawful price. This simply codifies the ceiling price corollary made plain in *Mobile-Sierra*: the statute's operation is limited to keeping sales prices from exceeding the ceiling, therefore contractual authority is required to collect permissible rates, and sellers are given no power to avoid the obligation of a fixed price contract. The statute and its legislative history confirm this view.

First, Congress knew how to codify existing contract prices as maximum lawful prices when it meant to do so. Sections 105 and 106(b) apply to gas under an intrastate contract that was in effect on the NGPA's date of enactment. These are the only NGPA provisions that expressly make the contract price the maximum lawful price. If the contract price on November 9, 1978, was greater than the section 102 new gas price, then under section 105(b)(2) the maximum lawful price is that November 9th contract price until the section 102 price catches up to the inflation adjusted contract price.[28] If, on the other hand, the price on

---

26. The Commission in a sense has "ancillary" jurisdiction under § 4 to determine whether sufficient contractual authority exists for it to entertain the rate increase filing. It is similar to federal court "jurisdiction to determine jurisdiction." *See, e. g., United States v. United Mine Workers of America*, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947). The Commission's § 4 ancillary jurisidiction to determine contractual authority is concurrent with state courts, not exclusive or primary. *Rowan v. Allied Chem. Corp.*, 39 F.P.C. 64 (1968).

27. In *Sierra*, provisions of the Federal Power Act virtually identical to the NGA were involved. The seller had a fixed price contract, therefore, on the authority of *Mobile* the Court held that the seller lacked authority to make a unilateral rate increase filing. The Court further noted that the seller can by contract agree to a rate affording less than a fair return on net capital, and the Commission may not relieve it of its improvident bargain unless the rate is so low that the public interest is adversely affected. The purpose of the Commission's statutory power to change rates is the protection of the public interest, not the private interests of sellers.

28. Under § 105(b)(2)(B)(ii), the November 9th contract price is adjusted monthly by an inflation factor provided for in § 101(a). The § 102 price is adjusted by the same monthly inflation adjustment factor, plus an additional "real growth" factor provided for in § 102(b)(2)(B). Although the contract price may be higher than the § 102 price initially, the faster rate of increase for the § 102 price means that at some point the two prices will "crossover." The maximum lawful price is then no longer the adjusted contract price, but instead switches to the higher § 102 price. 124 Cong.Rec. H13117 (daily ed. Oct. 14, 1978) (statement of Rep. Dingell).

November 9th was less than section 102, under section 105(b)(1) the maximum lawful price is the current price provided for under the terms of the contract as long as it does not exceed the section 102 price. Therefore, in the latter case, the intrastate contract price may escalate from its November 9th level to the section 102 level, provided that the contract has a sufficient escalation mechanism. H.R.Rep. No. 1752, 95th Cong., 2d Sess. 82 (1978); 124 Cong. Rec. H13117 (daily ed. Oct. 14, 1978) (statement of Rep. Dingell). Section 106(b) essentially carries forward for intrastate "rollover" contracts the section 105 pricing under the existing intrastate contract that expired at the end of a fixed term specified in the contract.[29]

Congress thus codified intrastate prices existing on November 9th if higher than section 102, but codified the "contract schedule of prices or contract mechanism for establishing prices *over time*" subject to the cap of section 102 if the November 9th price was less than section 102. 124 Cong. Rec. H13117 (daily ed. Oct. 14, 1978) (statement of Rep. Dingell) (emphasis in original). This elaborate incorporation of either the contract price or the contract escalation provisions into the maximum lawful price would have been totally unnecessary if section 101(b)(9) froze existing, November 9th contract prices.

Secondly, the critical language in section 101(b)(9) is not just the phrase, "supersede or nullify," but also the phrase, "price . . . established under [a] contract." The latter connotes contract terms that create or modify the price term. In other words, the rule in section 101(b)(9) includes a price established by an escalation clause.[30] It would be an entirely different case if section 101(b)(9) expressly referred to prices established or in existence on, for example, the

day of enactment of the NGPA (as section 105(b)(2) does).

Finally, the legislative history shows that section 101(b)(9) does not codify existing contract prices. Representative Dingell introduced a comprehensive explanatory statement into the Congressional Record to encourage enactment. 124 Cong.Rec. H13115–20 (daily ed. Oct. 14, 1978). With regard to section 101(b)(9), he stated that FERC had no direct enforcement authority of contract prices per se, only of maximum lawful prices, since section 101(b)(9) was simply a rule of construction and did not establish any requirements for ceiling prices. Because the statute imposes ceiling price regulation, Representative Dingell explained, the maximum lawful price supersedes the contractual arrangement only when the contract price exceeds the maximum lawful price; when the contract price is less than the maximum lawful price, the contractual arrangement continues to govern the parties' relationship. Note that it is the contractual *arrangement* and not the price alone that continues to govern. Representative Dingell was thus emphasizing that it is in the very nature of the ceiling price concept that the contract controls in the first instance, and that section 101(b)(9) is not a pricing provision.

In light of the *Mobile-Sierra* doctrine, and the ceiling price structure of NGPA and NGA producer rate regulation, this Court holds that section 101(b)(9) is Congress' express and specific intent not to preempt the ability of private persons to contractually govern their relationship. Although Consumers would convert the NGPA's structure into one based on controlled prices, section 101(b)(9) is simply a necessary component of the ceiling price concept: the statute overrides contractual provisions only to the extent that the contractual

---

**29.** Section 106(b) provides that the maximum lawful price is the higher of the maximum lawful price last paid under the expired contract, adjusted thereafter by the monthly inflation factor, or in the case of a rollover in April 1977, a per unit price of $1.00, also adjusted thereafter by the monthly inflation factor. This permits very low price intrastate contracts that

rolled over when the National Energy Plan was announced to receive some increase before becoming locked in until deregulation in 1985.

**30.** Sections 105(b)(3)(A) and 121(e), which limit the operation of certain indefinite price escalator clauses, also refer to a "price established under [an] indefinite price escalator clause."

terms provide for prices in *excess* of the statutory ceilings. Therefore, section 101(b)(9) is not a limit on the operation of area rate clauses.

### B. *The NGPA Conference Committee Report and Statutory Limitations on Contractual Escalation*

Varying interpretations of the Conference Committee Report's discussion of section 105(b)(3)(A) have unfortunately generated considerable debate and confusion with regard to legislative intent on the operation of area rate clauses. The Conferees stated that they did not intend mere establishment of NGPA ceiling prices to trigger *intrastate* contract indefinite price escalator clauses. It was this statement that formed the basis for section 270.205 of the Interim Regulations; the Commission extended the Conferee's discussion to apply also to interstate contracts, that is, establishment of NGPA ceiling prices would not trigger area rate clauses. Much of the argument between the parties centers on this Conference Committee language and its meaning. To properly interpret this language, however, the first step is to examine the statute to which this part of the legislative history relates.

▇▇ The NGPA limits the operation of escalation clauses in four instances. None of these has any applicability to the operation of area rate clauses. The first instance limits the operation of both indefinite price escalators[31] and definite price escalators, simply by the existence of the ceiling price of the category for which the gas under the contract can qualify. For example, section 105(b)(2) makes the November 9, 1978, contract price the maximum lawful price until that inflation adjusted price is surpassed by the section 102 price as adjusted for inflation and real growth. *See* note 28 *supra.* Escalator clauses in contracts subject to section 105(b)(2) are thus limited in their operation to the statutory inflation adjustment rate until the section 102 price becomes the maximum lawful price, at which time they can escalate at the inflation and real growth rates. 124 Cong.Rec. H13117 (daily ed. Oct. 14, 1978) (statement of Rep. Dingell). This same limited monthly escalation applies to all contracts whose prices have reached the ceiling cap of their respective applicable pricing category. Under section 105(b)(1), on the other hand, the maximum lawful price is the lower of the section 102 price or the current price under the existing intrastate contract (rather than the November 9th price). If the contract has an escalation provision, definite or indefinite, it may authorize collection of prices up to but not in excess of the section 102 price, and then can authorize collections only of prices equal to the statutory inflation and real growth adjustment rates. *See* H.R.Rep. No. 1752, 95th Cong., 2d Sess. 82 (1978); 124 Cong.Rec. H13117 (daily ed. Oct. 14, 1978) (statement of Rep. Dingell).[32] The only category with

---

**31.** The NGPA defines an indefinite price escalator clause as one that adjusts the contract price by reference to *other prices* for natural gas, crude oil, or refined petroleum products, or adjusts the price by negotiation between the parties. NGPA § 105(b)(3)(B), 15 U.S.C.A. § 3315(b)(3)(B).

Producers argue that area rate clauses do not come within this definition. They read the definition to mean a provision that refers to prices paid in other sales. Their interpretation would limit the definition to favored nation clauses, which expressly refer to prices paid in other sales. The statutory definition is not so narrow, however. The statute says "other prices for natural gas" and not "prices paid in other sales of natural gas" or even "other prices paid for natural gas." The statutory definition is broad enough to encompass provisions that refer to other prices permitted for natural gas, that is, ceiling prices. Therefore, § 105(b)(3)(B)

encompasses provisions that refer to other prices paid or permitted. After all, aside from the statutory definition, an area rate clause is an indefinite price escalator clause since it adjusts the initial price by reference to contingent events, rather than by a specific amount at definite future dates. *See* H. Williams & C. Meyers, Manual of Oil & Gas Terms 138 (4th ed. 1976). That area rate clauses fall within the definition of an indefinite price escalator clause does not, however, limit area rate clause operation. Area rate clauses must also fall within the terms of a statutory limitation, not just within a definition, for their operation to be statutorily circumscribed.

**32.** Definite escalator clauses simply increase the contract price steadily. If the contractual rate of increase is faster than the § 102 inflation and real growth adjustment rates, the contract priced under § 105(b)(1) would receive the

a higher regulated price than section 102 is section 108 (stripper well gas). Once the contract price is escalated to the section 102 price, the seller can receive the section 108 price only if the gas under the contract independently qualifies for section 108 pricing. If it does, then the escalation provision could authorize collection up to the section 108 price, and continue to authorize collections in accordance with the inflation and real growth adjustments provided for in section 108(a)(2).

The second limitation is section 105(b)(3)(A). This continues regulation for gas priced under section 105 and whose existing or successor contract price is determined by an indefinite price escalator provision. On the other hand, gas priced under section 106(b), regardless of whether the rollover contract's price is determined by an indefinite price escalator, and gas priced under section 105, but whose price is determined without any escalator or only by a definite escalator provision, is generally entitled to price deregulation in 1985.[33] Not only is gas priced under section 105(b)(3)(A) not entitled to deregulation, the continuation of maximum lawful prices for it prevents the indefinite price escalators from increasing the contract price from its current section 105 level to the deregulated price of some other producer. Too rapid an escalation in prices is prevented; deregulation occurs more gradually as individual existing and successor contracts expire by their own terms.

Section 313 provides two other limitations on the operation of indefinite price escalator clauses, for reasons similar to those underlying section 105(b)(3)(A). The first, section 313(a), is that any such clause (in both intrastate and interstate contracts) cannot escalate the contract price to the section 107 "high cost" natural gas price unless the gas under the contract qualifies for section 107 pricing. This prevents a producer from receiving the section 107 price merely because some other producer receives it.[34] The second, section 313(b), is that any indefinite price escalator clause may not escalate the contract price to section 302 emergency sale or section 302 emergency allocation prices. Again, section 313 limits the use of an indefinite price escalator clause to reach prices for which

---

§ 102 price at some point. Its escalation would then be limited to the § 102 rate of adjustment. If the intrastate contract contained a favored nation clause, the clause could elevate the contract price to the higher prices for other sales within the contract pricing area, but no higher than the current § 102 price. For example, a § 103 sale in the contract pricing area that was higher than the current contract price would trigger escalation of that contract to the § 103 price. This occurs even though the gas does not qualify for § 103 since the favored nation clause is free to operate and the § 103 price is currently less than the § 102 price. Similarly, the favored nation clause could escalate the contract price to the § 102 price paid in a sale in the contract pricing region. If the gas does not qualify for § 108 and there was a § 108 sale in the contract pricing area, however, the favored nation clause could escalate the contract price only to the § 102 price since the § 108 price is higher than § 102.

**33.** Section 121(a)(3), 15 U.S.C.A. § 3331(a)(3), provides that gas sold under an existing, successor, or rollover intrastate contract at a price on December 31, 1984, of more than $1.00 per MMBtu is no longer subject to any maximum

lawful price. Section 121(e) then provides that gas under an existing or successor intrastate contract, otherwise deregulated by § 121(a)(3), is subject to § 105(b)(3) if the contract price is established by an indefinite price escalator clause. Section 121(e) is thus a cross-reference to § 105(b)(3).

Section 105(b)(3)(A) limits the operation of indefinite price escalators by providing that if the existing or successor intrastate contract price is greater than $1.00 on December 31, 1984, and that contract price is determined by an indefinite price escalator clause, then once deregulation occurs under § 121(a)(3), the maximum lawful price will be the higher of the November 9, 1978, contract price, as escalated by the inflation adjustment factor, or the January 1985 § 102 price, as escalated by inflation and real growth adjustment factors, though the real growth factor here is smaller than the one for § 102 itself.

**34.** Some § 107 gas is now deregulated. FERC Order No. 78, No. RM79–44 (Apr. 25, 1980) (deregulating gas qualifying under § 107(c)(1) through (4)). The remainder receives the § 102 price.

the gas in question is not otherwise qualified.

Earlier bills limited the operation of contractual provisions that determine the contract price on the basis of "sales of other natural gas," and later refinements continued to preserve the scope of the limitation so as not to include area rate clauses. *Compare, e. g.,* S.1469, 95th Cong., 1st Sess. § 412(c) (1977) *with* 15 U.S.C.A. § 3315(b)(3)(A) & § 3373. This reflects the congressional awareness that area rate clauses do not pose the danger of increasing the contract price above the applicable ceiling, of bootstrapping the contract price to ineligible maximum lawful prices, or of prematurely increasing the contract price to a deregulated rate, since the area rate clause is keyed only to an *applicable regulated* price. The necessity to limit the operation of area rate clauses was thus absent.

The Conference Committee Report states that section 105(b)(3)(A) applies only to intrastate and not interstate contracts; the Report explained that FPC regulations barred the use of indefinite price escalator clauses in interstate sales. Clearly, the Conferees were referring to impermissible clauses prohibited by section 154.93, since area rate clauses were expressly permitted under FPC regulation of interstate contracts. *See also Texaco, Inc. v. FPC,* 317 F.2d 796, 800 (10th Cir. 1963), *rev'd,* 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964) (expressly referring to permissible provisions as definite price-changing clauses and to impermissible ones as indefinite price-changing clauses). This point is evident from the Conferees' entire discussion. For example, the Conferees further explained that they did not intend mere establishment of NGPA ceiling prices to trigger intrastate

contract indefinite price escalator clauses, but that once gas was sold pursuant to an NGPA ceiling price, indefinite price escalator clauses could be activated, as limited by section 105(b)(3)(A). In other words, favored nation clauses are triggered by prices paid in other sales, not by mere enactment of a ceiling price that is higher than the contract price at the time. Area rate clauses, in contrast, were triggered by establishment of higher permitted prices.[35] The Consumers' contention that the Conferees meant to limit the operation of area rate clauses is thus not supported by the statement in the Conference Committee Report. Therefore, Congress was not only aware of the use of area rate clauses in interstate contracts and of other types of indefinite price escalators in intrastate contracts, it expressly limited the operation of price escalator clauses in four instances, thereby allowing escalator clauses to otherwise operate according to their terms. None of these limits apply· to area rate clauses.

### C. *FERC Responsibility to Consumers*

FERC's interpretation of the NGPA as not precluding area rate clause escalation is not an abdication of its responsibility to protect consumers. The NGPA is a fundamental change in regulatory outlook. Contrary to the Supreme Court's assumption in *Phillips Petroleum Co. v. Wisconsin,* 347 U.S. 672, 74 S.Ct. 672, 98 L.Ed. 1035 (1954), which subjected gas producers to utility-type regulation under the NGA, Congress apparently decided that gas producers do not have "natural" monopoly power; that is, the industry does not possess the inherent technical characteristics that prevent its efficient and economical operation unless operated as a monopoly.[36] Therefore, the

---

**35.** Senator Jackson also remarked that § 105(b)(3)(A) applies only to existing intrastate contract indefinite price escalator clauses, that some interstate contracts have indefinite price escalator clauses, but that FPC regulations prohibit their operation, and that the Conferees had no intent to change those prohibitions. 124 Cong.Rec. S15021 (*daily ed. Sept.* 13, 1978). Again, area rate clauses were permissible, not prohibited by FPC regulations,

and interstate contract indefinite price escalators generally are either area rate clauses or are impermissible clauses that are subject to a certificate waiver of § 154.93 that allows these clauses to operate only as an area rate clause and no more.

**36.** *See* J. Bonbright, Principles of Public Utility Rates 10–13 (1961). The congressional assumption concerning lack of producer natural

theory that a regulatory agency is necessary to represent consumers when they bargain on rates with a natural monopolist like a utility no longer applies to gas production. *See generally* Goldberg, *Regulation and Administered Contracts*, 7 Bell J. Econ. 426 (1976). FERC has a fundamentally different regulatory obligation, a narrower authority to administer the NGPA and to prescribe *higher* price ceilings only in certain circumstances. *See* NGPA §§ 104(b)(2), 106(c), 107(b) & 109(b)(2), 15 U.S.C.A. §§ 3314(b)(2), 3316(c), 3317(b), & 3319(b)(2). The balance Congress struck already took into account the conflicting interests of producers and consumers.[37]

### D. The Justness and Reasonableness of NGPA Prices and Contractual Escalation

■ Thus, the NGPA does not preclude escalation of area rate clauses to NGPA prices. On the other hand, contrary to the Producers' assertion, the NGPA does not require that area rate clauses escalate prices to NGPA levels. Producers rely on section 601(b)(1), which deems any amount paid under the NGPA to be just and reasonable for purposes of NGA §§ 4 & 5.

Assuming without deciding that the NGPA deemed its prices just and reasonable for all purposes,[38] that does not by itself mean that escalator clauses *must* escalate to that price. Under the *Mobile-Sierra* doctrine and section 101(b)(9), the existence of ceiling prices—regardless of whether those prices are just and reasonable—does not of its own force escalate the contract price. That the statute does not preclude the escalation of area rate clauses merely leaves open whether section 154.93(b–1) and the contractual provisions themselves authorize that escalation.

monopoly power is evidenced in the phased deregulation of wellhead prices and the elimination of FERC regulatory control under the NGA over gas eligible for § 601(a)(1). The continuation of price controls on older, cheap gas reflects only a concern about preventing financial windfalls to sellers with very low-cost gas properties, and not a concern about natural monopoly power.

37. Congress carefully considered the economic impact of the NGPA in designing that Act. *See, e. g.,* H.R.Rep. No. 496, pt. IV, 95th Cong., 1st Sess. 96–101, 110–21 (1977); Natural Resources and Commerce Division, Congressional Budget Office, The Natural Gas Compromise (Aug. 2, 1978), *reprinted in* 124 Cong.Rec. H12126–27 (daily ed. Oct. 14, 1978); Energy Information Administration, U. S. Dep't of Energy, Analysis Memorandum No. AM/IA–7902, An Evaluation of Natural Gas Pricing Proposals (June 14, 1978). Consumers contend that FERC must also undertake an economic impact study to determine whether Order No. 23 is consistent with the legislative purpose. However, an economic study is required only when FERC must review rates to see if they are just and reasonable, or review a pipeline curtailment plan to see if it results in a just and reasonable allocation of gas. *See, e. g., North Carolina v. FERC*, 584 F.2d 1003 (D.C.Cir.1978) (end-use allocation). Therefore, FERC was not required to determine the economic impact of

Order No. 23 since the justness and reasonableness of NGPA ceiling prices is not at issue. "Just and reasonable" is merely a term of art for the public interest, and no one contends that congressionally established prices are not prescribed in the public interest.

38. FERC argues that the § 601(b)(1)(A) language "amount paid" refers only to pipeline payments of NGPA prices and not producer receipt of those payments. The statute, however, does not mandate such a narrow interpretation. The purpose of § 601(b)(1) is to set the necessary predicate for § 601(c). Section 601(c)(2) guarantees to interstate pipelines the ability to pass through NGPA payments. Clearly, that relates only to pipelines. Section 601(c)(1), however, provides that FERC may not deny or condition the grant of any certificate under NGA § 7 based upon the amount paid in a sale of gas if the amount is deemed just and reasonable under § 601(b). While the NGPA has reduced the universe of possible producer applications for NGA § 7 certificates for sales beginning after the enactment of the NGPA, it has not eliminated that universe. Since § 601(c)(1) can apply to producer as well as pipeline certificates, § 601(b)(1)(A) cannot be limited to pipeline payments simply on the basis of the language "amount paid." Whether there is some other support for FERC's view is left to a future decision.

## IV. FERC JURISDICTION TO REGU-LATE AND INTERPRET GAS PURCHASE CONTRACTS

■ Before reaching FERC's interpretation of section 154.93(b–1) and its position concerning contract interpretation, the threshold issue of FERC jurisdiction to interpret existing contracts and to apply its regulation to contracts must be resolved. For purposes of this opinion, existing gas purchase contracts can be divided into four categories. First, there are those contracts covering gas that remains within FERC jurisdiction under the NGA. Section 601(a)(1)(B) removes from continuing NGA jurisdiction sales of certain gas that nevertheless was committed or dedicated to interstate commerce on November 8, 1978, with this removal effective December 1, 1978. In short, this section reduces the amount of gas subject to the NGA. NGPA § 601(a)(1)(A) further provides that gas which on November 8, 1978, was not committed or dedicated to interstate commerce is exempt from NGA jurisdiction effective December 1, 1978, even if it is thereafter sold into interstate commerce. In other words, section 601(a)(1)(A) prevents the universe of gas subject to the NGA from expanding. Gas committed or dedicated to interstate commerce on November 8, 1978, and not removed from NGA jurisdiction by section 601(a)(1)(B), is priced under sections 104, 106(a), 108, or 109(a)(2).[39]

The second category of contracts, then, covers gas that once was but is no longer within FERC's NGA jurisdiction by virtue of NGPA § 601(a)(1)(B). This gas is under an existing interstate contract, but receives an incentive price under section 102 (new gas), 103 (new onshore production well), or 107 (high-cost gas). The third category is a hybrid of the first two—gas under an existing interstate gas purchase contract that is the subject of a pending eligibility determination that the gas qualifies for section 102, 103, or 107. Completion of the eligibility determination process would then result in section 601(a)(1)(B) removal of that gas from NGA jurisdiction.[40] The fourth and final category comprises existing intrastate rather than interstate, gas purchase contracts that cover gas priced under sections 105, 106(b), or one or the incentive price categories.

Under the *Mobile-Sierra* doctrine, contractual authority is necessary for a seller to make a valid rate increase filing under NGA § 4; therefore the Commission has "ancillary" jurisdiction to interpret the contract to find whether that contractual authority exists. Because NGA § 4 remains applicable to the first category, any seller who must file under NGA § 4 for a rate increase must do so to collect any rate increase authorized by NGPA §§ 104, 106(a), 108, or 109(a)(2). FERC thus retains NGA jurisdiction to interpret area rate clauses in the first category of contracts.[41] FERC

---

**39.** Sections 104 and 106(a) merely carry forward the most recent FPC national rate opinion. As FERC stated in Order No. 23, the section 104 prices are "based and inextricably linked to" previously prescribed FPC rates. Section 104 freezes the FPC rates as of April 20, 1977, and modifies in NGPA § 101 the inflation adjustment mechanism from that established by the FPC. Section 106(a) is essentially of the same nature as § 104, except that Congress utilized a specific formula that approximates prior FPC rates. Section 109(a)(2), on the other hand, is a catch-all provision when the gas cannot qualify under any other category. It applies to gas that was committed or dedicated to interstate commerce on November 8, 1978, but for which there was no just and reasonable NGA rate in effect on that date.

Section 108 is a special incentive rate for stripper wells, that is, marginal production. Unlike the other incentive rate categories, gas dedicated to interstate commerce is not removed from NGA jurisdiction upon qualification for § 108 pricing. The § 108 rate, however, is the highest regulated rate provided for by the NGPA.

**40.** Under NGPA § 503, 15 U.S.C.A. § 3413, state and federal agencies with regulatory jurisdiction over gas production determine whether gas qualifies for §§ 102, 103, 107, and 108. *These determinations are subject to FERC review.*

**41.** In other words, when the NGA continues to govern, the *Mobile-Sierra* doctrine continues to apply, which requires that FERC determine,

also retains jurisdiction to apply section 154.93 to these existing interstate contracts.

Since the second category comprises existing interstate contracts covering gas removed from NGA jurisdiction by section 601(a)(1)(B), FERC can no longer interpret or apply section 154.93 to these contracts. Whether such a contract authorizes escalation to NGPA prices is for state or federal courts to decide, unless the NGPA vested in FERC independent authority to interpret contracts concerning gas not within FERC's NGA jurisdiction.

Consumers contend that FERC has this independent authority under the NGPA. As support, they cite the section 501 general rulemaking authority to administer the NGPA, and its necessary or appropriate implementation and enforcement power. They also cite section 504, which declares it unlawful to sell gas at a rate greater than the applicable maximum lawful price or to otherwise violate any provision of the NGPA, and provides that, when enforcing the NGPA, FERC may seek federal court injunctive relief, impose civil penalties for knowing violations, and impose criminal penalties in certain cases.

If violating the contract constituted a violation of section 101(b)(9), as Consumers claim, and therefore a violation of "any" NGPA provision under section 504(a)(2), FERC could prohibit sales at a price above the contract price, rather than only sales at a price above the maximum lawful price. As discussed above, however, section 101(b)(9) simply expresses an intent that the mere establishment of federal ceiling prices does not preempt the contractual power of private parties. Selling above the

contract price violates not the NGPA but only private contractual limitations as long as the selling price does not exceed the applicable ceiling.[42] With the exception of sections 105 and 106(b) (the only provisions to actually incorporate the contract price as the maximum lawful price), FERC simply has no general contract price enforcement authority under the NGPA independent of that given it by NGA § 4 and NGPA §§ 105 and 106(b).

The third category concerns gas awaiting a jurisdictional agency determination that it qualifies for section 102, 103, or 107, which would trigger section 601(a)(1)(B) removal from NGA jurisdiction. FERC's NGA jurisdiction to apply section 154.93 and to interpret contracts seemingly continues until the eligibility determination is completed and becomes final. Shell Oil Company, however, contends that since section 601(a)(1)(B) makes removal of qualifying gas from NGA jurisdiction effective on December 1, 1978, a subsequent determination that the gas so qualifies should make that removal retroactive. From this they argue that FERC lacks jurisdiction over this gas, or in the alternative it is unreasonable for FERC to exercise such jurisdiction.

FERC has in fact provided in section 273.204 that a determination of eligibility for section 102, 103, or 107, will permit retroactive collection of those rates. The retroactivity of rate collection, however, does not answer whether FERC possesses NGA jurisdiction to regulate and interpret contracts until such time as the eligibility determination becomes final. The very nature of retroactivity is that the effectiveness must be *deemed* to have existed at a

---

when presented with a rate increase filing, whether the contractual arrangement between the parties authorizes the collection of NGPA rates. Since the NGPA maximum lawful price is congressionally prescribed in the public interest, there is no issue concerning the lawfulness of the rate increase. FERC thus need only decide the question of the seller's contractual authority to collect the NGPA prices.

**42.** Consumers also cite § 315(c), which provides that FERC may require the filing of new contracts with interstate pipelines. That sec-

tion, however, requires that only the interstate pipeline, not the producer, file the new contract. No authority to interpret existing interstate contracts is implied by such a provision. Section 315(c) gives FERC the ability to regulate specified nonprice terms and conditions of service—to police the duration of new contracts as required under § 315(a) and to enforce § 315(b) rights of first refusal upon expiration of contracts deregulated from NGA jurisdiction by § 601(a)(1)(B). *See* H.R.Rep. No. 1752, 95th Cong., 2d Sess. 110–11 (1978).

time which in fact it did not. Therefore, it is only when the determination process is complete that FERC loses its NGA jurisdiction over contract regulation and interpretation.

Whether FERC discretion to exercise its jurisdiction is reasonable in these circumstances is another question. When the gas is determined to qualify for removal from NGA jurisdiction, FERC then loses its jurisdiction and would have to dismiss any pending contractual interpretation determinations. This compels participation in proceedings that may later be rendered moot, and thus the parties will be inconvenienced and incur expenses needlessly. Protest proceedings completed prior to the final eligibility determination, though made when FERC had jurisdiction, would become void because of the retroactive lack of jurisdiction. This would necessitate burdensome court relitigation of the contractual authority issue since the void FERC decision would have no res judicata effect. The waste of legal resources that relitigating specific area rate clauses entails renders FERC's automatic exercise of this jurisdiction unreasonable. It is therefore incumbent upon FERC to reasonably exercise its discretion and allow producers who have made eligibility determination filings for sections 102, 103, and 107 to file for a stay of any protest proceeding until the pricing category determination is completed.[43] This Court thus partially sets aside Order on Rehearing of Order No. 23–B to the extent of FERC's position that it must interpret contracts in this third category and that any completed interpretations will govern until the eligibility determination becomes final.

The fourth category—existing intrastate contracts—is clearly beyond FERC's NGA contract interpretation jurisdiction. Since FERC has no independent section 101(b)(9) authority to interpret contracts, FERC's jurisdiction to do so is limited to a determination of what is the section 105 or 1066 ceiling price. Contractual authority questions concerning intrastate contract escalation provisions are otherwise left to state or federal courts.

## V. FERC INTERPRETATION OF SECTION 154.93(b–1)

Section 154.93, an exercise of the Commission's NGA power to determine whether rates are just and reasonable and to set aside any that are not, limited the type of contractual authority a producer could use. The Commission determined in advance that the impermissible clauses provided contractual authority to collect a price that, because it had no economic significance to the gas under the contract, was always unjust and unreasonable, that is, not in the public interest. By the same token, section 154.93(b–1) permitted a particular contract clause by which a higher FPC just and reasonable rate could be collected. Since the proposed rate increase was in the public interest, there was no reason to bar use of these escalator clauses. The touchstone, therefore, for application of section 154.-93(b–1) is whether the escalation is in the public interest. The question then is whether, with regard to gas remaining within FERC's NGA jurisdiction section, 154.93(b–1) permits area rate clause escalation to higher NGPA rates, rates congressionally prescribed in the public interest.

In Order No. 23, FERC interpreted section 154.93(b–1) to allow escalation to a higher rate if that rate was (1) regulated, (2) just and reasonable, (3) of general applicability to an area, and (4) applicable to the vintage category of the gas involved. It found the maximum lawful NGPA prices satisfied these criteria. The Commission determined that the public interest policy basis of section 154.93(b–1) and the past practice of flexible application of area rate clauses to collect FPC national and other

---

43. Such a stay may be sought under NGPA § 502(c), 15 U.S.C.A. § 3412. This permits any person to seek adjustments, including an exception or exemption from FERC rules or orders, as may be necessary to prevent special hardship, inequity, or an unfair distribution of burdens. A stay can also be sought under 18 C.F.R. § 1.7(b), which provides for petitions for waivers of Commission rules promulgated under the NGA, since it is the exercise of NGA jurisdiction over existing interstate contracts that is to be stayed.

rates,[44] rather that just area rates as stated in section 154.93(b–1), justified a broader and flexible, rather than literal, interpretation. Therefore, while the regulation's reference to the "Commission" and not to "Congress" may have some importance to the question of the intent of the contracting parties, it did not justify finding that the regulation prevented area rate clause escalation to higher NGPA prices.[45]

With regard to variant clauses that refer to legislatively set rates, FERC concluded that since escalation to congressionally prescribed rates is not contrary to the public interest, it would be entirely consistent with section 154.93(b–1)'s policy to permit such escalation. FERC reasoned that it could not rationally maintain that it is contrary to the public interest for parties to contractually bind themselves to congressional regulatory actions when the FPC had found it appropriate to allow parties to bind themselves to the outcome of proceedings in the exercise of congressionally derived authority.

 An agency's interpretation of its own regulation is entitled to great deference. *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). Administrative regulations are to be interpreted broadly and liberally to effectuate their essential purposes. *Baldridge v. Hadley*, 491 F.2d 859, 864 n.2 (10th Cir.), *cert. denied*, 417 U.S. 910, 94 S.Ct. 2608, 41 L.Ed.2d 214 (1974). In light of the policy underlying section 154.93 and the past flexibility in the

adaptation of area rate clauses to changes in the regulatory environment, FERC's interpretation that section 154.93(b–1) permits area rate and variant clause escalation to NGPA prices is not plainly erroneous, *United States v. Larionoff*, 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977), clearly unreasonable, *Homan & Crimen, Inc. v. Harris*, 626 F.2d 1201, 1208–09 (5th Cir. 1980), or inconsistent with the statute under which it was promulgated, *Larionoff*, 431 U.S. at 873, 97 S.Ct. at 2156.

VI. *CONTRACT LAW TO BE APPLIED IN DETERMINING WHETHER AREA RATE CLAUSES ARE SUFFICIENT CONTRACTUAL AUTHORITY TO COLLECT NGPA PRICES*

 In Order No. 23, FERC applied "general principles of contract law" to find that as a general rule area rate clauses could be sufficient contractual authority to collect NGPA prices. It then established protest procedures in which the sufficiency of specific area rate clauses could be determined if contested by the pipeline purchaser or certain third parties. FERC stated it would apply these same general principles of contract law in the protest procedures. This Court affirms the use of general contract law in determining not to preclude area rate clause escalation generally as a matter of contract law, but holds that specific determinations of contractual authori-

---

**44.** *See* FPC Opinion No. 742, 54 F.P.C. 853, 858 (1975) (small producer gas); FPC Opinion No. 699, 51 F.P.C. 2212 (1974), *aff'd, Shell Oil Co. v. FPC*, 520 F.2d 1061 (5th Cir. 1975), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2661, 49 L.Ed.2d 394 (1976) (rollover contract gas and flowing but undedicated gas).

**45.** Similarly, although the regulation specifies "just and reasonable" rates, that literal language cannot serve to prevent area rate clause escalation to NGPA rates. Congress deemed any amount paid in conformity with the strictures of the NGPA to be just and reasonable for purposes of NGA §§ 4 & 5. NGPA § 601(b)(1)(A), 15 U.S.C.A. § 3431(b)(1)(A). Without deciding whether this deemed justness and reasonableness is for all purposes, *see* note 38 *supra*, it is sufficient to note that "just and

reasonable" is a term of art in utility regulation generally meaning cost-based rates under the methodology for prescribing utility rates that are in the public interest. *See, e. g., FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944). FPC producer regulation generally used the cost-based ratemaking methodology, but the FPC also prescribed ceiling rates for producers that included incentive-based rates. The regulation's reference should therefore not be tied to the then prevailing ratemaking methodology, but instead to the purpose of that methodology—prescription of rates that are in the public interest. Congressionally established rates are of course prescribed in the public interest, and therefore are within the meaning of "just and reasonable" as used in section 154.93(b–1).

ty in the protest procedures must take account of and follow any differences with general contract law that the appropriate state contract law may have.[46]

This holding is a direct result of the application of the doctrine in *Erie Railroad v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The *Erie* decision did not just construe the Rules of Decision Act to include state decisional law in the phrase "law of the several states." It was also a constitutional decision: Because of the unfairness in applying two different, conflicting standards to the same conduct, and the incentive for forum shopping that a differing federal and state rule would create, in a scheme of limited federal and reserved state powers, state substantive law remains the rule of decision unless federal law has preempted that substantive rule. 304 U.S. at 73–78, 58 S.Ct. at 820–822. Nor does *Erie* apply only to federal court diversity jurisdiction.[47] The federalism concern of *Erie* is applicable to every federal tribunal when federal substantive law has not expressly or impliedly displaced the state substantive law on the particular question for decision.

*Erie* is necessarily implicated in this case because FERC has concurrent jurisdiction with state and federal courts over interpretation of escalation provisions in contracts that remain within FERC's NGA jurisdiction, and because only courts have jurisdiction to interpret escalation provisions in contracts not within FERC's NGA jurisdiction (with the exception of section 105 and 106(b) contracts). The very evil that *Erie* addressed would arise if FERC followed one substantive rule while state courts followed another: parties whose contracts are within concurrent FERC and court jurisdiction would be subject to two different rules for the same conduct, and each would have an incentive to have their contract interpreted in the forum applying the rule most favorable to that party. *Erie* achieves not uniformity of result, since identical language can carry different contractual intent depending on the circumstances, but instead uniformity of applicable law. No matter which forum the interpretation is made in, the same body of law—either state or federal—would apply.[48]

Neither the NGPA nor the NGA expressly preempt the application of state contract law to the interpretation of gas purchase contracts. The NGA was carefully fashioned to exert federal control only in a limited and well-defined area. It is well-established that contractual claims between parties to a natural gas contract do not arise under the NGA for purposes of federal question jurisdiction of federal courts.[49] The *Mobile-Sierra* doctrine holds that the NGA did not abrogate the ability of the

---

**46.** Because of the important federalism issues involved when a federal tribunal applies contract law, this Court raised the issue of which contract law to apply sua sponte at oral argument and requested supplemental briefs on the issue. FERC contends that under NGA § 19(b), 15 U.S.C.A. § 717r(b), and NGPA § 506(a)(4), *id.* § 3416(a)(4), this Court lacks jurisdiction to raise the issue itself. Because the parties to this litigation strongly dispute the scope of FERC's jurisdiction to interpret contracts and the correctness of its determination that area rate clauses could be sufficient contractual authority to collect NGPA prices, the issue of what body of law FERC may apply is necessarily raised. This Court therefore has jurisdiction to raise and decide this question.

**47.** *First Southern Federal Sav. & Loan Ass'n v. First Southern Sav. & Loan Ass'n*, 614 F.2d 71, 73 (5th Cir. 1980); *Maternally Yours, Inc. v. Your Maternity Shop, Inc.*, 234 F.2d 538, 540 n.1 (2d Cir. 1956).

**48.** If an issue is controlled by federal law, state courts exercising concurrent jurisdiction are bound by that law. U.S.Const. art. VI, cl. 2; *Free v. Bland*, 369 U.S. 663, 82 S.Ct. 1089, 8 L.Ed.2d 180 (1962).

**49.** *Phillips Petroleum Co. v. Texaco, Inc.*, 415 U.S. 125, 94 S.Ct. 1002, 39 L.Ed.2d 209 (1974); *Pan Am. Petroleum Co. v. Superior Court of Delaware*, 366 U.S. 656, 81 S.Ct. 1303, 6 L.Ed.2d 584 (1961); *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 70 S.Ct. 876, 94 L.Ed. 1194 (1950); *City of New Orleans v. United Gas Pipe Line*, 390 F.Supp. 861 (E.D.La. 1974). Nor does the NGA provide an implied private cause of action for damages against a producer in favor of local distributors and ultimate customers for failure to comply with delivery obligations. *Clark v. Gulf Oil Corp.*, 570 F.2d 1138 (3d Cir. 1977), *cert. denied*, 435 U.S. 970, 98 S.Ct. 1611, 56 L.Ed.2d 62 (1978).

parties to privately contract within the regulatory confines of that Act. NGPA § 101(b)(9) provides the same with respect to the NGPA. Therefore, the federal legislation and regulation of this area does not directly address the interpretation of gas purchase escalation provisions.

■ That, of course, does not exhaust the analysis since state law can be preempted by "federal common law" even if there can be no "federal general common law." [50] Federal common law arises when the issues involve so strong a federal interest that it is appropriate to resolve them on the basis of uniform decisional federal law rather than varying state laws. One such area concerns federal legislation that fails to directly address the precise and narrow issue but nevertheless a valid and substantial federal interest or policy requires the application of federal law as an exercise of interstitial lawmaking to protect or to effectuate the federal scheme. *First Southern Federal Savings & Loan Ass'n v. First Southern Savings & Loan Ass'n*, 614 F.2d 71, 73–74 (5th Cir. 1980). If there is a significant conflict between the identifiable federal policy or interest and the use of state law, the state law is preempted. *Miree v. De-Kalb County*, 433 U.S. 25, 31, 97 S.Ct. 2490, 2494–2495, 53 L.Ed.2d 557 (1977); *Wallis v. Pan American Petroleum Corp.*, 384 U.S. 63, 68, 86 S.Ct. 1301, 1304, 16 L.Ed.2d 369 (1966).[51] The determination of whether federal common law applies looks to the need for uniformity of result, the federal interest in the regulated subject matter, and the comprehensiveness of that regulation.[52]

■ That a contract is subject to federal regulation does not by itself demonstrate that Congress intended federal rather than state law govern all aspects of its performance; if the federal interest is sufficiently served by the agency's express regulatory power, it requires some other indication of congressional policy that the contracts should be ruled by uniform federal principles. *Ivy Broadcasting Co. v. AT&T*, 391 F.2d 486, 490 (2d Cir. 1968). The federal scheme of regulation under the NGA and NGPA is limited in its displacement of state regulatory authority. Unlike the Federal Communications Act, in which *Ivy* found federal common law governed contractual disputes involving interstate telephone service, the NGA and NGPA are not so pervasive a scheme of federal regulation as to indicate a congressional objective that cannot be attained without the application of federal common law. *City of New Orleans v. United Gas Pipe Line*, 390 F.Supp. 861, 865–66 (E.D.La.1974).

■ Uniformity of result is not assured by the creation of federal common law here. When interpreting escalation clauses, FERC possesses expertise with respect only to technical matters, not with respect to the correct application of the same contract interpretation principles that courts use to fathom the parties' intent. *Compare Texas Gas Transmission Corp. v. Shell Oil Co.*, 363 U.S. 263, 80 S.Ct. 1122, 4 L.Ed.2d 1208 (1960) *and Warren Petroleum Corp. v. FPC*, 282 F.2d 312 (10th Cir. 1960) *with Pure Oil Co. v. FPC*, 299 F.2d 370 (7th Cir. 1962).[53]

**50.** *Clearfield Trust Co. v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943); *Ivy Broadcasting Co. v. AT&T*, 391 F.2d 486 (2d Cir. 1968); C. Wright, The Law of Federal Courts § 60, at 279, 286 (3d ed. 1976); Friendly, *In Praise of Erie—and of the New Federal Common Law*, 39 N.Y.U.L.Rev. 383, 405 (1964).

**51.** If the issue of escalation clause interpretation is governed by federal common law, that common law would be binding on state and federal courts. *Free v. Bland*, 369 U.S. 663, 82 S.Ct. 1089, 8 L.Ed.2d 180 (1962); *First Southern*, 614 F.2d at 73.

**52.** This analysis is the modern or so-called "implied" preemption approach. *See, e. g., Pennsylvania v. Nelson*, 350 U.S. 497, 76 S.Ct. 477, 100 L.Ed. 640·(1956).

**53.** *Zachary v. FERC*, 621 F.2d 155 (5th Cir. 1980), *cert. denied*, —— U.S. ——, 101 S.Ct. 795, 66 L.Ed.2d 611 (1980), is not to the contrary. There FERC was required to decide whether or not the contract at issue was a "replacement contract" and therefore entitled to the more favorable replacement contract rate. This Court stated that the resolution of the issue of rate entitlement necessarily required an interpretation of the contract, a mat-

Since the escalation clause's meaning depends on the contracting parties' intentions, which in turn depends on the circumstances of its execution, identical language in different contracts could be interpreted to have different meanings, so even a federal rule of construction would lead to different results. *Kansas Power & Light Co. v. Mesa Petroleum Co.*, No. GP79–4 (FERC Aug. 10, 1979); *Arkansas Louisiana Gas Co. v. Frank F. Hall*, No. RI76–28 (FERC May 18, 1979), *petition for review filed*, No. 79–2068 (D.C. Cir. Sept. 10, 1979). Ascertaining the parties' intent is a matter of case-by-case adjudication not susceptible to considerations of uniformity such as exist in a rulemaking proceeding. That area rate clauses were drafted as a result of section 154.93(b–1) does not require that federal common law principles apply to area rate clause interpretation. While FERC has special expertise to interpret the regulation itself, the question of the parties' intent is a different matter altogether.[54] Courts can be easily informed of the language, purpose, and history of the regulation when presented with an area rate clause for interpretation. This information is already available in the preambles to the orders here under review. Courts are not any less able to take this into account when construing contracts.

Nor does the federal interest in the subject matter demand the application of federal rules here. The federal concern that the contract price not exceed the applicable ceiling price is adequately protected by FERC's express enforcement authority with respect to maximum lawful prices; section 101(b)(9) permits contractual arrangements to otherwise operate according to their terms. Indeed, this Circuit has specifically rejected the contention that federal common law applies to Commission interpretations of contracts under *Mobile-Sierra*. *Phillips v. FERC*, 586 F.2d 465 (5th Cir. 1978). The question there was whether nonoperating owners of gas had effectively exercised their contractual right to revoke the lease operator's authorization to sell their gas. FERC applied federal law to find that the owners were bound by the operator's contract with the pipeline though not direct parties to it, and therefore rejected their rate increase filing under NGA § 4. This Court vacated and remanded the Commission decision. FERC's primary concern in these cases is with the integrity of the contractual relationship between the parties, but that does not warrant the erection of an extensive federal common law of contracts in the area of natural gas, nor a more limited federal law to determine which contract governed. 586 F.2d at 469.[55]

ter within FERC's special competence. *Id.* at 158. This, however, was in response to an attack on FERC jurisdiction to interpret the contract at all, not whether anything is to be gained by its interpretation rather than by that of some other decider. Nor can the reference in the Supreme Court's *Memphis* case to the "special competence" of the Commission be taken out of its context there to create federal common law here. That reference was in response to whether that case should be remanded to the Court of Appeals for consideration of the contractual authority issue. 358 U.S. at 114, 79 S.Ct. at 200. Because the Supreme Court was satisfied with the Commission's resolution, it found remand to be unnecessary and dilatory. Therefore, the references in *Memphis* and *Zachary* should only be taken to mean that the Commission, in light of its experience in ascertaining contractual authority for rate increase filings, is as competent as a court to make such determinations, and not that the Commission is more competent than courts in this area. Indeed, the Supreme Court in *Memphis* stated that further examination of the rec-

ord by the Court of Appeals could hardly aid the Supreme Court, and it therefore reviewed the Commission's determination itself. *Id.*

54. Even though the language of a contract may be identical with that of a statute, the contractual language can have a scope independent of the proper construction of the statute. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 678, 70 S.Ct. 876, 882, 94 L.Ed. 1194 (1950). The same words, in different settings, may not mean the same thing; parties do not necessarily endow statutory language in a contract with the scope of the statute, particularly when the same term may have variant meanings for different applications of the statute. *Id.* The same can be said for contracts that draw on regulatory rather than statutory language.

55. Furthermore, in *City of New Orleans* the district court refused to find a mandate for federal common law with regard to contractual disputes between pipelines and their curtailed customers over gas supply despite the nationwide natural gas shortage at the time. 390

Finding that there is no significant conflict between any federal interest and the use of state law in the interpretation of escalation provisions in gas purchase contracts, this Court holds that the appropriate contract law to apply is the law that would govern the parties' dealings were there no regulation at all of the contract's subject matter.[56] *See Phillips*, 586 F.2d at 469 (applying Texas law to issue of contractual authority to file for rate increase under NGA). *See also Premier Resources, Ltd. v. Northern Natural Gas Co.*, 616 F.2d 1171, 1180 (10th Cir.), *cert. denied*, —— U.S. ——, 101 S.Ct. 92, 66 L.Ed.2d 31 (1980) (applying Oklahoma law to whether a provision constituted an area rate clause); *Sam Rayburn Dam Electric Cooperative v. FPC*, 515 F.2d 998, 1009 (D.C.Cir.1975), *cert. denied*, 426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976) (applying Texas law to issue of contractual authority to file for rate increase under Federal Power Act); *Warren Petroleum*, 282 F.2d at 316 (applying Oklahoma law to question of novation in dispute over FPC interpretation of favored nation clause).[57]

In light of this holding, FERC must take into account, in resolving a particular contractual authority dispute, the law of the state that would apply to its resolution under appropriate choice of law rules. Unlike the substantive contract issue, the determination of which state's contract law applies is properly a matter within federal common law. FERC does not sit in any one particular state but instead the nation itself is its forum. The interstate nature of this choice of law inquiry makes this matter one essentially federal in character.

FERC need not undertake this determination in every case, however. In the interest of administrative convenience, it is reasonable to put the burden on the parties to inform FERC if the state law that should apply is any different from the general principles that FERC utilizes. This frees the Commission from the burden of determining the proper choice of state contract law in every case. Since the Uniform Commercial Code applies to natural gas sales as the sale of goods, U.C.C. § 2–107(1), and all states except Louisiana have adopted the UCC, variations between state law and general principles are likely to be few. When such differences appear, however, FERC must follow the state law. The orders below are thus modified accordingly.

## VII. FERC APPLICATION OF GENERAL PRINCIPLES OF CONTRACT LAW

FERC determined that it was not an unreasonable interpretation of the parties' in-

F.Supp. at 865–66. In *California v. Southland Royalty Co.*, 436 U.S. 519, 98 S.Ct. 1955, 56 L.Ed.2d 505 (1978) (4–3 decision), on the other hand, the federal interest in preventing the loss of gas from the interstate market was decidedly greater and justified overriding state property law on the issue of whether particular acreage remained dedicated to interstate commerce under NGA § 7. *Southland* is also closer to *United Gas Improvement Co. v. Continental Oil Co.*, 381 U.S. 392, 400, 85 S.Ct. 1517, 1522, 14 L.Ed.2d 466 (1965), which held that the meaning of the NGA should not be tied down to technical concepts of local law. The issue before FERC in the protest procedures is not, however, the meaning of the statute or a regulation, but instead the meaning of a contract.

**56.** The following cases are not contrary to this result: *City of Oglesby v. FERC*, 610 F.2d 897 (D.C.Cir.1979); *Public Service Co. v. FPC*, 557 F.2d 227 (10th Cir. 1977); *Appalachian Power Co. v. FPC*, 529 F.2d 342 (D.C.Cir.), *cert. denied*, 429 U.S. 816, 97 S.Ct. 58, 50 L.Ed.2d 76

(1976); *Richmond Power & Light v. FPC*, 481 F.2d 490 (D.C.Cir.), *cert. denied*, 414 U.S. 1068, 94 S.Ct. 578, 38 L.Ed.2d 473 (1973). In these cases the issue was not whether state contract law applied to the interpretation of the contract, but whether state regulatory law or process concerning ratemaking applied to or was incorporate in the contract.

**57.** The issue of whether to apply state or federal law was not reached by the Supreme Court in *Texas Gas Transmission Corp. v. Shell Oil Co.*, 363 U.S. 263, 80 S.Ct. 1122, 4 L.Ed.2d 1208 (1960), a case in which the FPC had construed a favored nation clause. 363 U.S. at 276, 80 S.Ct. at 1130. On remand, the Third Circuit refused to decide the issue since it held Louisiana law did not differ from general contract doctrine on the issue at hand, so that in either case the result would be the same. *Shell Oil Co. v. FPC*, 292 F.2d 149, 153 (3d Cir.), *cert. denied*, 368 U.S. 915, 82 S.Ct. 195, 7 L.Ed.2d 131 (1961).

tent to conclude that as a general rule area rate clauses were sufficient authority to collect NGPA prices. FERC would thus not interpose any general objection to the parties ascribing an interpretation to area rate clauses as contractual authority to collect NGPA prices, leaving the specific determination to be handled case-by-case in the protest procedures.

When interpreting a contract, the question is what was the parties' intent, since courts are compelled to give effect to the parties' intentions. *Western Beef, Inc. v. Compton Investment Co.*, 611 F.2d 587, 592 (5th Cir. 1980). To determine this intent, the court must put itself in the position of the parties by considering the instrument itself, its purposes, and the circumstances of its execution and performance. *See Superior Oil Co. v. Western Slope Gas Co.*, 604 F.2d 1281, 1288–89 (10th Cir. 1979). In short, the court looks to the language of the contract and its commercial (or in this case, regulatory) context. U.C.C. § 1–205, Official Comment 1, § 2–202 & Official Comment 1 & 2. *See Chase Manhattan Bank v. First Marion Bank*, 437 F.2d 1040, 1046 (5th Cir. 1971).

Consumers contend, in reliance on the parol evidence rule, that when the language is plain and unambiguous, the parties' intention must be discerned solely from the contract language without resort to extrinsic evidence. They then assert that since there is no ambiguity on the face of area rate clauses, consideration of the commercial context is inappropriate. This position is a misapplication of the parol evidence rule and has been expressly rejected by the UCC. U.C.C. § 1–205, Official Comment 1, § 2–202, Official Comment 1(b) & (c). The test is whether the extrinsic evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible; the "plain meaning" position of the Consumers ignores the parties' intentions or presumes "a degree of verbal precision presently unattainable by our language." *Lucie v. Kleen-Leen, Inc.*, 499 F.2d 220, 221 (7th Cir. 1974).

The parol evidence rule excludes extrinsic evidence offered to vary or contradict, rather than to explain and interpret, the terms of an integrated contract. 3 A. Corbin, Corbin on Contracts § 543, at 130 (1960). It is only after consideration of the extrinsic evidence that the parol evidence rule applies—if in light of the circumstances and purposes of the contract the court finds it unambiguous and integrated, parol evidence of a party's subjective intentions cannot be used to change the contract's meaning. *Lucie v. Kleen-Leen, Inc.*, 499 F.2d at 221; *Chase Manhattan*, 437 F.2d at 1048; 3 A. Corbin, *supra*, § 543, at 130–31, § 579, at 412–13. In other words, since perception is conditioned by environment, it is proper to consider the contract's commercial setting even though the contract is not facially ambiguous. *Chase Manhattan*, 437 F.2d at 1046. Furthermore, ambiguity often arises from the application of the contract to the subject matter of the agreement, and extrinsic evidence is admissible to remove and explain any ambiguity in the contract as applied. *Sunbury Textile Mills, Inc. v. C. I. R.*, 585 F.2d 1190, 1196 (3d Cir. 1978). Ambiguity easily arises when the contract is applied to its subject matter in changed circumstances. Area rate clauses are certainly ambiguous as applied to the collection of currently available ceiling rates for natural gas. A contract should be interpreted in light of the changed circumstances to accomplish what the parties intended. *See Richmond Power & Light v. FPC*, 481 F.2d 490, 499 (D.C. Cir.), *cert. denied*, 414 U.S. 1068, 94 S.Ct. 578, 38 L.Ed.2d 473 (1973).[58]

---

**58.** Consumers also cite in support of their position *J. M. Huber Corp. v. Denman*, 367 F.2d 104, 109 (5th Cir. 1966), and *Texas Eastern Transmission Co. v. FPC*, 306 F.2d 345, 347–48 (5th Cir. 1962), *cert. denied*, 375 U.S. 941, 84 S.Ct. 347, 11 L.Ed.2d 273 (1963). These two cases cut against rather than support the Consumers' position. Both cases state that when construing a contract, the court is to put itself in the position of the parties. In *Texas Eastern* this meant that the agreement must be read in the setting of the NGA. This Court then looked to the circumstances of the execution of the gas rate settlement there and found that be-

FERC determined that given the regulatory environment prevailing under the NGA, the flexible application of area rate clauses to collect national and incentive ceiling rates, and the substantial agreement among the contracting parties as to the meaning of area rate clauses, a strict, literal interpretation of the clauses was inappropriate. This Court holds that FERC reasonably concluded that area rate clauses, even those that literally track section 154.-93(b–1), could constitute sufficient authority to collect NGPA prices, subject to specific protests by pipelines or third parties. FERC reasonably concluded from the contract language and its regulatory and commercial context that it was not unreasonable for the parties to have meant to contract for whatever regulated rate was available, and not necessarily to have intended to limit the *source* of those ceilings.[59] FERC properly limited its conclusion to a general and not conclusive rule in light of the reality that, since it is a question of the parties' intent, this conclusion may not be the case for every contract: One pipeline asserted that it intended for the price to escalate to a rate set after agency proceedings, safeguarded by adversary participation and opportunity for judicial review. The protest procedure permits the airing of interpretive differences such as these.[60] In light of the changed circumstances brought about by the enactment of the NGPA, it was reasonable for FERC to provide for the opportunity to interpret area rate and vari-

cause of the close scrutiny with which the FPC gave such proposed settlements before giving its approval thereto, the settlement language had been crafted with almost certain precision and the parties should be bound thereby. In *Huber,* this Court thought that there was ample evidence to justify the conclusion that the parties' use of terms well-recognized in oil and gas law should be given their literal meaning. It was only after considering contextual matters that the Court found it reasonable to ascribe to the parties' intentions the literal meaning of their language.

*Harrison v. FERC,* 567 F.2d 308, 310 (5th Cir. 1978), is not to the contrary. This Court stated that in interpreting the document there, plain meaning controls absent ambiguity or special usage. Aside from the fact that *Harrison* involved construction of an FPC certificate of public convenience and necessity rather than a private contract, this cryptic statement permits the use of the commercial context since "special usage" is just one such matter. *See* U.C.C. § 2–202(a) (permitting evidence of "usage of trade" to explain contract).

Despite Consumers' contentions, *Louisiana Power & Light Co. v. FERC,* 587 F.2d 671, 675 (5th Cir. 1979), is also not supportive of their view. There this Court said that if the parties had in fact agreed to give the utility the right to file unilateral rate changes, the contracts should have stated as much in unambiguous terms, rather than leave such an important right to implication. In this case, the parties expressly provided for the seller's right to file unilateral rate changes—the area rate clause. The question presented in this case is what sort of rate that provision can include in light of the changed circumstances.

**59.** *See* U.C.C. §§ 1–205(4) & 2–208(2). These provide that the express terms of the agreement and any course of performance, course of dealing, and usage of trade shall be construed whenever reasonable as consistent with each other. If such a construction is unreasonable, express terms control course of performance, and course of performance shall control course of dealing and usage of trade. In this case, the contractual provisions for escalation to the federal ceiling rates prescribed by the FPC may reasonably be construed consistently with the subsequent flexible use of area rate clauses to collect the highest ceiling price the FPC legally permitted with the advent of national ceiling rates and incentive ratemaking. This consistent construction may result in a reasonable interpretation that the parties meant to make pricing a matter tied to governmental decision whenever the government chose to act.

**60.** Much of the dispute over the application of contract law concerns variant escalation clauses. Many of these variants provided the additional language "other governmental authority" or "successor governmental authority" concerning prices prescribed by the "Commission." It is clear that Congress is a governmental authority with the power to prescribe ceiling rates of general applicability that are in the public interest, and that it is an "other" governmental authority. Since Congress delegated its ratemaking authority to the FPC and then re-assumed that ratemaking function with the enactment of the NGPA, Congress is not the delegatee of the FPC. It is, however, its *successor* since a successor is one who follows or takes the place of another in the sense of serial replacement, so that a delegator can succeed or replace its delegatee. Whether the use of "successor" was so intended to include Congress, however, depends on how the parties used that term in the contract.

**390**

ant escalation clauses to accomplish what the parties intended rather than to categorically interpret them literally to the defeat of this intent.

## VIII. *FERC PROTEST PROCEDURES*

■■■ It was within FERC discretion to implement its NGA § 4 authority by adopting the protest procedures in Order No. 23–B. Because the NGA § 4 filing requirement pertains only to interstate contracts for gas still subject to FERC's NGA jurisdiction, the protest procedures were of course properly limited to assertions of contractual authority to collect NGPA §§ 104, 106(a), 108, and 109(a)(2) prices by means of an interstate contract area rate or variant clause.[61] The real battle here is not over the decision to adopt protest procedures,[62] but instead all parties complain about the reasonableness of the exercise of that discretion in the actual design of the procedures.[63]

■■ Producers contend that FERC unlawfully placed the burden of proof on sellers to show specific contractual authority in cases of pipeline protests. This argument is based on their initial premise that there is a conclusive presumption that area rate clauses are sufficient contractual authority to collect ceiling prices of general applicability such as NGPA prices. They reason that the producer should not be made to prove what is already conclusively presumed to exist. There is no conclusive presumption, however, since the question is what was the parties' intent relative to the scope of the contractual clause. This determination depends on the actual language of the clause, the commercial and regulatory context, and substantive contract law. Since it is the producer who must have contractual authority to make the rate increase filing, the Commissioner properly allocated the burden of proof in cases of pipeline protests.

61. Consumers argue that FERC improperly limited its protest procedures to gas remaining within the NGA. This argument proceeds on its interpretation that NGPA § 101(b)(9) gives FERC enforcement authority with regard to contract price violations that do not implicate the NGPA ceilings. As this opinion made clear in Part III, the Consumers' position in this regard is meritless. This Court holds that FERC properly limited its protest procedure to contracts covering gas for which the NGA § 4 filing requirement remains applicable.

With respect to existing intrastate contracts, FERC has jurisdiction to interpret escalation provisions to the extent that it must do so to determine the maximum lawful § 105 and § 106(b) price. Because there is no filing requirement to collect these prices, FERC is not required to address the issue of contract interpretation when asked to do so. The same is true for those enjoying "small producer" status and thus under 18 C.F.R. § 157.40 may raise rates to ceiling levels without filing rate schedules (contracts) or make rate increase filings, even though the gas sales are subject to NGA regulation. *See Arkansas Louisiana v. Frank F. Hall*, No. RI76–28 (FERC May 18, 1979), *petition for review filed*, No. 79–2068 (D.C.Cir. Sept. 10, 1979). FERC declared in Order No. 23 and Order on Rehearing of Order No. 23 that it would leave any intrastate contract interpretation questions to the parties and state and federal courts. *See also Kansas Power & Light Co. v. Mesa Petroleum Co.*, No. GP79–4 (FERC Aug. 10, 1979) (order dismissing petition for declaratory order with regard to proper inter-

pretation of intrastate contract escalation provision covering gas priced under § 105(b)(1)).

62. Producers do contest the authority of FERC to adopt the protest procedure in Order No. 23–B. The argument for this lack of authority is that FERC unlawfully repealed a conclusive presumption that area rate clauses are sufficient contractual authority to collect ceiling prices of general applicability such as NGPA prices. While there may have been a conclusive presumption that area rate clauses were sufficient authority to collect NGA ceiling prices, it does not necessarily follow that it is sufficient authority to collect NGPA prices, since the question is whether the parties intended to collect the highest available regulated price or a more narrow intent looking to FPC rate proceedings. Although FERC found area rate clauses could be sufficient authority as a general rule, it is only a general rule, and the outcome properly depends upon the particular contract, its commercial and regulatory context, and the application of substantive contract law. Therefore, no conclusive presumption was unlawfully repealed.

63. This Court has already disposed of the issue concerning the reasonableness of FERC's inclusion within the scope of the protest procedures of gas under an interstate contract awaiting the final outcome of a pending eligibility determination that would result in removal of that gas from NGA jurisdiction. *See* note 43 and accompanying text *supra*.

■ Producers also contend the FERC illegally allowed third party protestors to contest the pipeline and producer's mutual interpretation that the area rate clause provides sufficient contractual authority to collect NGPA prices. The third parties that FERC allowed to protest the parties' assertions are consumers and those representing their interests: the FERC Staff, state regulatory commissions, local distribution companies, and consumer groups. The Producers reason that the only standing these strangers to the contract have is to contest the justness and reasonableness of rates proposed in the rate increase filing. Because congressional prescription of the NGPA ceiling rates eliminates the issue of the lawfulness of the rate increase, only pipelines, not third parties, would, under Producers' position, have standing on the contract interpretation issue.

Concepts of administrative standing are not congruent with article III case or controversy standing requirements. *Gardner v. FCC*, 530 F.2d 1086, 1090–91 (D.C.Cir. 1976). *Accord, Koniag, Inc., Village of Uyak v. Andrus*, 580 F.2d 601, 611–17 (D.C. Cir.1978) (Bazelon, J., concurring), *cert. denied*, 439 U.S. 1052, 99 S.Ct. 733, 58 L.Ed.2d 712 (1978). In the context of agency responsibility for implementation of statutory goals, a requirement of privity to raise a protest is much too narrow. Pipeline customers are parties in interest, even though not actual parties to the contract, because it is they who must ultimately bear the cost of any higher prices.[64] Third party protestors therefore meet the standing requirement of 5 U.S.C.A. § 555(b) to lodge a protest with the Commission over the contracting parties' assertion of contractual authority. Section 555(b) provides that an interested person may appear before an agency for the presentation, adjustment, or determination of an issue, request, or controversy in a proceeding, whether interlocutory, summary, or otherwise, or in connection with an agency function. Because FERC must determine whether there is contractual authority when presented with a rate increase filing, the protest by third parties is in the nature of an intervention in an already existing proceeding, and not the initiation of a contract action against the parties to the contract. In this administrative context there is no impropriety in granting third parties standing to protest the contracting parties' interpretation.[65]

In recognition, however, that third parties are indeed strangers to the contract, their standing to protest carries certain procedural restraints that a pipeline protestor does not bear. Consumers contest the reasonableness of these procedural restraints. They claim that the protest procedures are a sham because they give no real opportunity for a fair and informed adjudication of the protest in violation of fifth amendment procedural due process.

■ Consumers allege that they bear an unreasonable burden in having to come forward with substantial evidence to rebut the reasonableness of the parties' mutual interpretation. However, when the parties are in agreement on the meaning of their contract, that mutual interpretation is entitled to considerable weight since the parties know best what they meant by their words of agreement. *See Sunbury Textile Mills, Inc. v. C.I.R.*, 585 F.2d 1190, 1196 (3d Cir. 1978); *United States v. F.D. Rich Co.*, 434 F.2d 855, 859 (9th Cir. 1970); *Louisiana-Nevada Transit Co. v. Woods*, 393 F.Supp. 177, 184 (W.D.Ark.1975); U.C.C. § 2–208, Offi-

---

**64.** Under NGPA § 601(c), interstate pipelines are guaranteed passthrough of NGPA prices except in cases of fraud or abuse. State regulatory commissions, consumer groups, and the FERC Staff, organizations with consumer protection responsibilities, have as much of an interest as actual consumers in the issue of contractual authority.

**65.** *Cf. Memphis Light, Gas & Water Division v. FPC*, 250 F.2d 402, 404 (D.C.Cir.1957), *rev'd on* other grounds sub nom. *United Gas Pipe Line Co. v. Memphis Light, Gas & Water Division*, 358 U.S. 103, 79 S.Ct. 194, 3 L.Ed.2d 153 (1958) (stranger to contract was aggrieved within meaning of NGA § 19(b) for purpose of judicial review when that stranger, a purchaser from a direct customer of the seller, had agreement with direct customer to reimburse that customer for any cost increase from approval of the seller's rate increase).

cial Comment 1. Indeed, when the "harmonious recital" of the contract's meaning is supported by extrinsic evidence, it has been said to be conclusive despite the assertions of one not a party to the contract but having an interest in its underlying transaction. *Sunbury*, 585 F.2d at 1196.[66]

Thus, it is proper to provide a rebuttable presumption in favor of the parties' interpretation as a matter of contract law. Nor is such a presumption violative of due process. Rebuttable presumptions serve as burden-shifting devices, allowing the government to efficiently act on an individualized basis when so required by due process. *See United States Department of Agriculture v. Murry*, 413 U.S. 508, 518, 93 S.Ct. 2832, 2838, 37 L.Ed.2d 767 (1973) (Marshall, J., concurring).[67] This brings us to the next contention.

Consumers argue that FERC has effectively made its presumption conclusive because it prejudged the only evidence the protestors easily have available—the language of the area rate clause itself. They claim that they lack the resources to discover evidence in producer and pipeline files. They argue that the inability to find other language in the contract or other evidence negating the conclusion of contractual authority prevents them from discharging their burden of production necessary to overcome the presumption in favor of the parties' interpretation and receive a hearing. This argument must fail. To be-

gin, protestors do have available upon specific request not only copies of the pipeline's evidentiary submission containing the area rate clause, but in addition the entire contract is available both in FERC's files and the public files of each natural gas company. Secondly, the protestors are properly given the burden of any additional discovery at their expense since they are challenging the parties' interpretation. The presumption in favor of that interpretation is the same as that which arises from a prima facie case: it imposes on the party against whom it is directed the burden of going forward with substantial evidence to rebut or meet the presumption, but does not shift the burden of persuasion. Therefore, protestors need not prove the lack of contractual authority, but only produce some evidence to the contrary. *See* Fed.R.Evid. 301.

The Consumers' assertion that a hearing imposes the financial burden on them of finding the witnesses who actually negotiated the particular area rate clauses, so as to determine the intent of the parties, is meritless because the producer and pipeline bear the burden of persuasion by a preponderance of the evidence once the protestor survives summary dismissal and receives a hearing. Furthermore, the language of the contract, its commercial context, and other probative extrinsic evidence may suffice without the testimony of those who negotiated the contracts. This Court thus con-

**66.** Consumers cite *United States v. Ivey*, 414 F.2d 199, 203 (5th Cir. 1969), to the effect that this Circuit takes a position opposite to that in *Sunbury*. This assertion is in error. *Ivey* held that the parol evidence rule applies not only to disputes between the parties over a contract's meaning, but also when a party asserts a subjective intent that contradicts the contract in a dispute with one not a party to the contract but having an interest in its underlying transaction. It is thus in full accord with *Sunbury* since under the parol evidence rule extrinsic evidence can explain, but not contradict, the contract when there is no facial ambiguity.

**67.** The lack of a rebuttable presumption obstacle for pipeline protestors does not violate the equal protection element of fifth amendment due process. For economic regulation, the equal protection test is a rational relationship between the means and the end. *See, e. g., Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). This deferential standard of review is satisfied in this case. First, if the parties cannot agree, there is no presumption that must be overcome. Second, the difference in procedural burden for protestors to reach a hearing is further justified by the different nature of the protestors and the different interests that they have. The pipeline, as a direct party to an ongoing relationship, is not likely to protest unless it has good reason to do so. Third parties, on the other hand, have greater incentive to file protests with little or no merit so as to delay contractual escalation. Therefore, the difference in procedural burdens is a reasonable means to achieve the end of preventing third party abuse of the protest procedures.

cludes that the protest procedures do not deprive third party protestors of procedural due process.[68]

## IX. *CONTRACT AMENDMENTS*

In Order No. 23–A the Commission determined that parties were free to amend or modify their contracts to provide for the collection of NGPA prices, and would not define in a rulemaking any general standards for pipeline passthrough of NGPA prices that result from a contract amendment. The NGPA precludes pipeline guaranteed passthrough of NGPA prices when FERC determines that the amounts paid are excessive due to fraud, abuse, or similar grounds.

With regard to contractual amendments as sufficient authority for ceiling rate collection, FERC declined the Consumers' request that it require the parties to make an evidentiary submission of the amendment similar to the submission required in Order No. 23–B. Consumers contend that fraud, abuse, or lack of consideration in the creation of the amendment is a matter that goes to contractual authority and that this should properly be within the Order 23–B protest procedures. The Commission, however, refused to so inject itself into the amendment process. This was entirely proper. The parties remain free to contract

within the parameters of the NGPA ceiling price structure, therefore they can freely amend their contracts to collect NGPA prices. Whether the amendment is valid is a matter of substantive contract law—an issue separate and independent of the regulatory issue of whether a pipeline may pass through increased costs from an amendment. For gas still subject to the NGA § 4 filing requirements, FERC can determine whether the amendment is sufficient authority to file for the rate increase. For gas not subject to NGA § 4, it is for state or federal courts to resolve disputes concerning the validity of an amendment.[69]

It was also proper for FERC not to promulgate general standards for pipeline passthrough of NGPA prices pursuant to contractual amendments, but rather to leave the determination of whether the amounts paid are excessive because of fraud, abuse, or similar grounds, to case-by-case review in each pipeline's purchased gas adjustment proceeding. It is within an agency's discretion to determine which enforcement methods—rulemaking, adjudication, or a combination of both—are most appropriate. *NAACP v. FPC*, 425 U.S. 662, 668, 96 S.Ct. 1806, 1810–1811, 48 L.Ed.2d 284 (1976). FERC reasonably exercised this discretion given the difficulty in defining which facts constitute fraud or abuse. It

68. Nor do the protest procedures violate the Administrative Procedure Act. NGA § 4 requires a hearing on the justness and reasonableness of a proposed rate, not on the ancillary jurisdiction question of contractual authority. An APA-type hearing applies only when the enabling or organic statute requires an adjudication on the record after opportunity for an agency hearing. 5 U.S.C.A. § 554(a). Therefore, the procedural obstacle for third parties to overcome to receive a hearing does not violate the APA.

69. Order No. 23–A and the Order on Rehearing of Order No. 23–A did not address the issue of how the contractual amendment may be made. In the Notice of Proposed Rulemaking FERC indicated that a contractual modification was to be evidenced by a "contract amendment or separate letter agreement." FERC did recognize in Order No. 23–B that the parties' subsequent conduct can modify the original terms of a contract. *See Louisiana Power & Light Co. v. FERC*, 587 F.2d 671, 676 (5th Cir. 1979);

*Sam Rayburn Dam Elec. Coop. v. FPC*, 515 F.2d 998, 1007, 1009 (D.C.Cir.1975), *cert. denied*, 426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976). Such a modification can occur if the buyer unconditionally pays the higher price requested by the seller. *See Southern Natural Gas Co. v. FPC*, 361 F.2d 70, 70 (D.C.Cir.1966). The pipeline's concurrence in the producer's assertion that the area rate clause is sufficient contractual authority to collect NGPA prices may in some cases also constitute an amendment to the existing contract to pay those rates, rather than simply an interpretation of the original contract. *See* U.C.C. § 2–208(3) & Official Comment 3. These issues are properly left to be resolved in specific cases.

FERC expressly left open the issue of retroactive operation of express amendments in both Order No. 23 and the Order on Rehearing of Order No. 23–A. This Court refuses to pass on this issue at this time and leaves it for FERC to address in the first instance.

always remains free to initiate a rulemaking on the issue of passthrough preclusion if after experience it finds the task can be more suitably addressed generically.

## X. CONCLUSION

Faced with a monumental task not foreseen by Congress, FERC had to resolve the contractual authority issue as efficiently as possible. The orders under review here represent a reasonable approach to FERC's responsibility. In such cases, this Court is most hesitant to invalidate FERC's efforts. Because the orders do not violate the NGPA or the NGA, and are for the most part not arbitrary, capricious, an abuse of discretion, irrational, or unreasonable, they are in the main upheld.

AFFIRMED IN PART, SET ASIDE IN PART, AND MODIFIED IN PART.